**JOS. SCHLITZ BREWING CO., a Wisconsin corporation, Plaintiff,**

v.

**TRANSCON LINES, a California corporation, Defendant.**

**No. 80–C–236.**

United States District Court, E.D. Wisconsin.

May 31, 1983.

Robert H. Friebert and David P. Lowe, Milwaukee, Wis., for plaintiff; John J. Culhane, Joseph Schlitz Brewing Co., Milwaukee, Wis., of counsel.

Terrence J. Gaffney, Milwaukee, Wis., and Christopher Ashworth, Los Angeles, Cal., for defendant.

## FINDINGS OF FACT and CONCLUSIONS OF LAW

REYNOLDS, Chief Judge.

This is an action brought under the Carmack Amendment to the Interstate Commerce Act, 49 U.S.C. § 11707. Plaintiff Jos. Schlitz Brewing Company (Schlitz) seeks to recover for damages sustained to a cargo of empty beer cans transported by the defendant Transcon Lines (Transcon). A court trial was held from March 28 through April 5, 1983. This constitutes the Court's findings of fact and conclusions of law pursuant to Federal Rules of Civil Procedure 52(a).

## FINDINGS OF FACT

The plaintiff Schlitz was in May of 1977 a corporation organized and existing under the laws of the State of Wisconsin, having its principal place of business at 235 West Galena Street, Milwaukee, Wisconsin. Schlitz was primarily engaged in the business of making beer, and manufactured and distributed a beer labeled "Old Milwaukee." In May 1977, Schlitz produced beer at seven breweries, two of which were located in Memphis, Tennessee, and Van Nuys, California, which is near Los Angeles.

The defendant Transcon is a corporation organized and existing under the laws of the State of California, having its principal place of business at 101 Continental Boulevard, El Segundo, California. Transcon is a common carrier providing motor carrier services subject to the jurisdiction of the Interstate Commerce Commission. Transcon has terminals and offices throughout the United States, including the Memphis and Los Angeles metropolitan areas.

In May 1977, Schlitz hired Transcon to move approximately 3.1 million empty beer cans with the Old Milwaukee label from Schlitz's Memphis plant to its Van Nuys plant. When the first few loads of cans arrived in Van Nuys, Schlitz employees rejected the shipment. It was discovered that many cans had sustained physical damage either by falling off of the pallets onto which they had been loaded or by otherwise being scratched or dented. However, the main damage was that the entire shipment of cans was contaminated with fibers from the chipboard that separated the layers of cans.

The empty beer cans were produced by a contract plant of American Can Company in Memphis. Although Schlitz Container Division supplied Schlitz breweries with beer cans, Schlitz also obtained cans from outside manufacturers and from contract plants whose output was fed directly into the breweries. The American Can Company plant in Memphis was such a contract plant. The facility was connected to Schlitz's Memphis plant in space leased by Schlitz. The cans were fed by conveyor through a wall directly into Schlitz's plant. Once the cans came through the wall, they either entered the Schlitz production lines immediately or else were loaded onto pallets and warehoused.

Empty cans are loaded onto the pallets by a machine known as the palletizer in the following manner. Each pallet is a wooden skid 44″ by 56″. The palletizer first places a layer of cans on the pallet with their open ends up and then pieces of chipboard are placed on top of the layer of cans. This process is repeated until there are a total of 18 layers of cans on the pallet. On top of the last piece of chipboard is placed a wooden frame known as a picture frame. Finally steel bands are run over the top of the palletized load, down the sides, around the bottom, and up the other side. These bands are tightened to hold the load together. Palletized cans would then be removed from the pallets and fed into the production lines of Schlitz's Memphis plant as needed.

As American Can produced the cans, they were sampled and inspected by Schlitz. The cans were checked for correct dimensions and for their appearance. Then two tests were performed to insure that the enamel lining on the inside of the cans was intact and that no metal was exposed. During the period around May 1977, no problems with the enamel lining were apparent.

Empty cans entering the production line were first inspected and then cleaned. The

inspection was a simple visual inspection. At the beginning of the line, bunches of cans were funneled into a single file. A worker stationed at the funneling area inspected the cans by looking down into them either directly or through a mirror positioned overhead. Once the cans were funneled into a single file, they were then rinsed with an air jet and then with water, and turned upside down during this process. After the cans were filled, random cans were tested for clarity by holding the contents up to a light. Schlitz never experienced any chipboard fiber contamination of cans used in its Memphis production line.

On May 1, 1977, the Schlitz Container Division employees in California went on strike. To insure an adequate inventory of cans, Schlitz directed the Memphis brewery to ship approximately 3.1 million of its empty Old Milwaukee steel cans to the Van Nuys plant. Ted Thurmon, Schlitz's Inventory Control Coordinator in Memphis, was directed to contact Transcon. Thurmon had two conversations with Transcon regarding the shipment. In the first telephone conversation, Thurmon indicated that Schlitz wanted the cans to be picked up in 45-foot trailers with swing-out doors. In the second telephone conversation, which took place a day or day and a half before the first trucks were loaded, the Transcon representative asked Thurmon if Schlitz would accept pup trailers (27 or 28-foot trailers). Thurmon advised that the cans had to be picked up on 45-foot trailers with swing-out doors, not roll-up doors. The 45-foot trailers were desired because Schlitz wanted to use only two loading docks to load the trucks, and the swing-out doors were desired to ease the loading of the pallets of cans. At no time did Schlitz indicate to Transcon that shipping the cans in pup trailers would be acceptable.

The pallets that were shipped were chosen at random from those pallets warehoused in Memphis. To prepare the pallets for shipment, Schlitz employees inspected the pallets for dented cans or voids created from cans that had fallen out and substituted new cans. In a few instances, the tension on the load was too much to allow a new can to be slid in. The employees next slid corrugated cardboard shrouds into the sides of the palletized loads between the cans and the side bands. This would further guard against cans falling out during shipment. Shrouds had not typically been used in prior shipments, but because of the size of this shipment, Schlitz had directed that special care be taken to prevent loss of cans during shipment. The corrugated cardboard that was used for shrouding was taken from incoming shipments of bottles on which the corrugated cardboard had been used as shrouding. Finally, the employees taped some of the side corners of the shrouding together.

From May 17 through May 21, 1983, Schlitz employees loaded the 45-foot trailers provided by Transcon with pallets of cans. Each trailer was loaded with 18 pallets of cans, positioned in two rows of nine pallets each. The pallets loaded first were bunted against the front of the trailer, and then subsequent pallets were bunted up against each other and the side of the trailer. This left a couple of inches between each row of pallets of cans, and about three feet at the back of the trailer. The employees nailed two-by-four inch boards to the floor immediately behind the last pallets to brace them. While a single two-by-four brace is usually used in shipping empty cans, two two-by-four braces were used for this shipment. No bracing was placed in the middle of the trailer. A total of 24 45-foot trailers were loaded in this manner. Each trailer held 129,276 cans, so that the total shipment consisted of 3,102,624 cans. Transcon issued 24 bills of lading to Schlitz for the shipment.

Transcon conveyed each trailer to its terminal in West Memphis, Arkansas, located approximately ten miles from the Schlitz Memphis brewery. There, Transcon personnel unloaded each 45-foot trailer and transferred the pallets onto 27-foot or 28-foot pup trailers. Some of these pup trailers had a flat front, so the pallets were simply bunted up against the front of these trailers. Other pup trailers had a wedged-shape nose at the front. In loading these

trailers, Transcon personnel first loaded two pallets side-by-side into the center of the nose. Thus there was a void area in the very tip of the noses. The remaining pallets were then bunted up against these two front pallets, forming two rows along the sides of the trailers. Each pup trailer except for one or two held 10 pallets of cans.

During the transfer of the cans, the Transcon personnel noticed that a number of cans had fallen out of the pallets. To reduce the amount of further loss, the Transcon personnel recoopered the palletized loads. They did this principally by adding tape to hold the pallets together better, although in some cases they added to the shrouding that Schlitz employees had put on the pallets.

In the space at the back of the pup trailers behind the loaded pallets, Transcon added cargo from other shippers that was destined for Los Angeles. In some cases, a sheet of plywood was put up against the last pallets to separate them from the additional cargo, generally when the additional cargo extended above the top of the pallets. In only a few cases did Transcon personnel brace the pallets by nailing two-by-four inch boards to the floor immediately behind the last pallets.

The journey from Memphis to Los Angeles was about 1800 miles long. This was an unusually long distance for Schlitz to transport empty cans by truck. The next longest shipment of empty cans by truck was a 1100 mile trip from Memphis to New York. Typically, for such long distance transportation, Schlitz had transported empty cans by rail.

Transcon's city drivers delivered the first few pup trailerloads to Schlitz's Van Nuys brewery. When Schlitz employees opened the doors to the trailers, they found a large number of loose cans on the trailer floors and a number of pallets that had virtually disintegrated. It was apparent that a great deal of cans had suffered damage. Because of the deterioration of the pallets, it was impossible to unload the trailers without further damage. In the first few trailerloads that were delivered, Schlitz employees did not observe any bracing of the pallets. Transcon was relieved of delivering the remaining trailerloads to the Van Nuys brewery and the damaged loads were placed in a warehouse.

Although approximately 60,000 cans sustained physical damage or fell out of the pallets, a greater problem was that the inside of the cans had been contaminated with a film of chipboard fibers. Although Schlitz tried to remove the fibers, it was unable to do so. This rendered the entire shipment unusable. Total damages for loss of the shipment came to $234,408.42. Excluding cans that were damaged only by fiber dust contamination, the damages came to $3,000.

Although certain facts regarding the contamination were agreed upon by the parties, neither the defendant nor the plaintiff could adequately explain why the fibers that fell into these cans could not be rinsed out so as to make the cans usable. The parties stipulated that the cans were not usable as delivered because of the fibers. Further, it is undisputed that the source of the contamination was the chipboard used to separate layers of cans on the pallets, and that the fiber dust resulted from friction between the open tops of the cans and the chipboard separators as they vibrated during transportation. The parties' dispute was over why the fibers could not be adequately rinsed out of the cans so as to make them usable.

The defendant's theory was that a problem with the enamel lining in the cans made removal of the fibers difficult. Defendant supported this theory primarily with the testimony of Dr. Gaston Vandermeerssche. Dr. Vandermeerssche testified that he examined certain cans taken from one of the pallets. He found that in about 50 percent of the cans, the enamel coating on the inside contained imbedded particles and bubbles. These steel cans were composed of two pieces, the bottom and side, that were put together with a double seam. This differed from extruded aluminum cans where the side and bottom are one piece. Dr. Vandermeerssche testified that in his

opinion, the fibers would not rinse out because they were held in place by the surface tension resulting from the imperfections in the enamel coating and the close surfaces in the bottom seam of the steel cans. Dr. Vandermeerssche also testified that varying temperatures and humidities encountered as the cans were shipped would result in the fibers sticking to the cans.

The plaintiff's theory was that the defendant's handling of the cans during shipment generated an excessive amount of fiber dust and especially large fibers, and that this made removal of the fibers difficult. Dr. Philip Himmelfarb testified that when such fibers absorbed moisture, they would swell and become lodged in the bottom seam of the cans. He also testified that he had never before seen a shipment of cans arrive containing the size and quantity of fiber particles observed in the shipment carried by Transcon.

The Court finds neither theory persuasive. Dr. Vandermeerssche's observations regarding the enamel coating are based on a small sample of cans taken from one pallet. Since they were taken from one pallet, the cans would have been coated at about the same time. Because many variables affect the quality of the coating, the quality of coatings on one pallet indicates little about the quality of coatings on another pallet. Dr. Vandermeerssche's sample was not a statistically relevant sample. The Court similarly finds that Dr. Himmelfarb's explanation was speculative and untested. The Court finds that the reason the fiber dust could not be economically removed from the cans has not been shown.

Finally, the Court finds that Schlitz knew that shipment of materials with chipboard or cardboard separators generated fiber dust contamination. Schlitz hired Dr. Vandermeerssche to investigate what could be done to eliminate fiber dust contamination of its final product, and his research indicated that fiber dust is always generated by shipping materials with chipboard or cardboard separators. Schlitz was unconcerned with contamination of its empty cans and bottles because it believed the rinsing proc-

ess was adequate to remove any contamination of the containers prior to filling. This had been Schlitz's experience. The Court accepts Dr. Vandermeerssche's conclusion that fiber dust is generated by any movement of the pallets.

Dr. Vandermeerssche's research on shipments of the final product indicated a roughly linear relationship between the number of fiber particles generated and the distance traveled. It also indicated that after traveling a certain distance, approximately 400 miles in the case of filled cans, the size of the particles generated would increase. Dr. Vandermeerssche opined that the same would be true in shipments of empty cans, although the threshold would not necessarily be 400 miles and the number of particles produced by traveling a certain distance may be different. The Court accepts Dr. Vandermeerssche's conclusion that the number of fiber particles produced would bear a roughly linear relationship to the distance traveled and that after traveling beyond some threshold distance the size of the particles would increase.

## CONCLUSIONS OF LAW

A shipper makes out a prima facie case under the Carmack Amendment when he shows delivery in good condition, arrival in damaged condition, and the amount of the damages. *Missouri Pacific Railroad v. Elmore & Stahl*, 377 U.S. 134, 138, 84 S.Ct. 1142, 1144, 12 L.Ed.2d 194 (1964). The Court holds that Schlitz has made out a prima facie case. The pallets that were transported were randomly chosen from the pallets in the Memphis warehouse. The testimony indicates that the remaining pallets were used without any problems of fiber contamination appearing. This created an inference that the shipped cans were also in good condition. The defendant has failed to overcome this inference by claiming that the unshipped cans were not subjected to the same tests as those that were shipped. There was no dispute that the cans arrived with chipboard fibers in them which made them unusable nor was there any issue over the amount of damages the plaintiff sustained.

■ Once the plaintiff shipper makes out its prima facie case, the carrier's defenses are limited. Although the carrier is not an absolute insurer, the carrier is liable for the damage to the transported goods "unless it can show that the damage was caused by '(a) the act of God; (b) the public enemy; (c) the act of the shipper himself; (d) public authority; (e) or the inherent vice or nature of the goods.' " *Martin Imports v. Courier-Newsom Express, Inc.,* 580 F.2d 240, 242 (7th Cir.) (quoting *Missouri Pacific Railroad,* 377 U.S. at 137, 84 S.Ct. at 1144), *cert. denied* 439 U.S. 983, 99 S.Ct. 574, 58 L.Ed.2d 655 (1978). The burden of proof is on the carrier to show both that the carrier was free from negligence and that the damage to the cargo was due to one of the excepted causes listed above. *Id.* The carrier has failed to meet its burden with respect to the $3,000 in physically damaged cans but that the carrier has met its burden with respect to the fiber dust contamination.

■ A carrier is liable for cargo damage even when that damage was caused by improper packaging or improper loading by the shipper unless the defect is latent and not discoverable through ordinary observation. *See Minneapolis, St. Paul & Sault Ste. Marie Railroad v. Metal-Matic, Inc.,* 323 F.2d 903, 906–07 (8th Cir.1963); *Armour Research Foundation of Illinois Institute of Technology v. Chicago, Rock Island and Pacific Railroad,* 297 F.2d 176, 178 (7th Cir. 1961); *Eastern Motor Express, Inc. v. A. Maschmeijer, Jr., Inc.,* 247 F.2d 826, 828–29 (2d Cir.1957), *cert. denied* 355 U.S. 959, 78 S.Ct. 535, 2 L.Ed.2d 534 (1958). The risk that the cans might fall off of the pallets should have been apparent to Transcon at the time they picked up the loads. It certainly became apparent to Transcon when they transferred the pallets to pup trailers, since at that time the Transcon employees noticed cans falling off of the pallets and so they recoopered a number of pallets. Because the packaging defects were patent, Transcon remains liable under the Carmack Amendment for physical damage to the cans.

■ Transcon cannot be held liable for the fiber dust contamination. On such a long journey, the manner in which the cans were packaged on the pallets made a certain amount of fiber dust contamination inevitable. Schlitz chose to use chipboard to separate the layers of cans, not Transcon. The manner of packaging the cans, i.e. palletizing them with chipboard separators, was under Schlitz's exclusive control. Additionally, Schlitz knew that fiber dust was generated during such shipments, although they were not concerned about contamination of empty containers because rinsing had always been adequate to remove any contamination.

Transcon had no reason to know of the potential contamination problem. The defect in the packaging that resulted in the contamination was latent, not patent. Although it was foreseeable that failure to properly brace the loads would lead to physical damage to the cans, it was not foreseeable to Transcon that the shipper would pack the cargo with material that could contaminate the cargo. The fiber contamination was generated by normal vibrations encountered through transportation, and Transcon could have done nothing to prevent the contamination. Because the fiber dust would have been generated even if Transcon never transferred the pallets to pup trailers, any negligence in reloading the pallets onto the pup trailers was not the proximate cause of the fiber dust contamination.

The real problem in this case was that the fiber dust could not be rinsed out, and neither party could adequately explain why that occurred. Nonetheless, the Court holds that the defendant has met its burden of showing that the damage resulted from the inherent nature of the goods as packaged by the shipper. Except for providing the normal vibrations that result from transportation, Transcon had no control over any of the factors that might have played a role in the contamination problem. Schlitz did in that it placed chipboards over the open sharp end of its cans. To meet its burden of proof, it is not necessary that the

defendant prove the exact reason why the chipboard fibers could not be removed from the cans. It is sufficient that the defendant show that the various factors which possibly contributed to the problem were within the control and exclusive knowledge of the shipper. *Cf. Wisconsin Electric Power Company v. Zallea Brothers, Inc.,* 606 F.2d 697 (7th Cir.1979).

THEREFORE, IT IS ORDERED that judgment shall be entered providing that the plaintiff shall recover of the defendant the sum of $3,000 plus costs.