**WISCONSIN ELECTRIC POWER COMPANY, a Wisconsin Corporation, Plaintiff-Appellant,**

v.

**ZALLEA BROTHERS, INC., a Delaware Corporation, Defendant-Appellee.**

No. 78–2086.

United States Court of Appeals, Seventh Circuit.

Argued April 26, 1979.

Decided Sept. 7, 1979.

As Amended Sept. 12, 1979.

William P. Croke, Milwaukee, Wis., for plaintiff-appellant.

Gilbert W. Church and Richard H. Porter, Milwaukee, Wis., for defendant-appellee.

Before MOORE, Senior Circuit Judge *, PELL, and WOOD, Circuit Judges.

MOORE, Circuit Judge.

This action, wherein federal jurisdiction is predicated on diversity of citizenship, 28 U.S.C. § 1332 (1976), was brought in the District Court for the Eastern District of Wisconsin, by Wisconsin Electric Power Company (hereinafter "WEPCO") a public utility that generates electricity and furnishes steam through underground tunnels for heating buildings in the downtown area of the City of Milwaukee. WEPCO sought to recover from Zallea Brothers, Inc. ("Zallea") approximately $800,000 in monetary damages sustained as a result of the failures of Zallea's product which was incorporated into WEPCO's steam line. After a lengthy and complex trial, the court (Judge John W. Reynolds) found for Zallea on all claims in a comprehensive opinion, reported in 443 F.Supp. 946 (E.D.Wis.1978). The court subsequently denied plaintiff's motion to amend the judgment and findings of fact and conclusions of law issued by the court. 454 F.Supp. 36 (E.D.Wis.1978). For the reasons given below, we affirm. Because of the previous consideration given by the trial court to the parties' contentions and the proof in support thereof, we will state only the essentials necessary for appellate review.

### I.

In 1967, WEPCO was building a new combination electricity and steam plant in downtown Milwaukee and a new thirty-inch diameter pipeline to transmit the steam to various locations. The new pipeline required "expansion joints", devices attached between steam pipes to absorb the movement caused by the pipes' expansion and contraction with the flow of the steam. In April of 1967, WEPCO sent out specifications and requests for bids to numerous

---

* The Honorable Leonard P. Moore, United States Senior Circuit Judge for the Second Circuit, is sitting by designation.

expansion joint manufacturers, including Zallea.

WEPCO received bids from seven different expansion joint manufacturers. Two different types of joints were actively considered: (1) "slip" joints and (2) "bellows" or "packless" type joints. Bellows joints contain corrugated metal walls that absorb pipe movement by flexing back and forth as the attached steam pipes expand or contract; slip joints do not have this feature of flexible metal corrugation. Although bellows joints have a lower initial cost than slip joints and require no maintenance, they are more susceptible to "stress corrosion cracking". Stress corrosion cracking occurs when metal that is in a stressed condition is attacked by a corrosive agent that eventually causes a crack to be forced through the entire thickness of the metal.

In submitting its bid, Zallea advised WEPCO that it strongly recommended the use of a metal alloy known as "Monel" for the bellows joints if chlorides were to be present in the steam. Subsequently, WEPCO made some changes in its specifications and incorporated Zallea's suggestion that Monel be used as the metal in the expansion joints. WEPCO then accepted Zallea's bid. Zallea supplied 170 thirty-inch joints as well as numerous twelve and fourteen-inch joints. By the end of 1968, WEPCO had properly installed the joints in its steam lines.

After the joints were placed into operation, seven of the joints developed cracks in their walls causing steam to escape. To prevent further failures, WEPCO removed and replaced the Zallea bellows joints with slip joints. Subsequent investigation revealed that the failures were caused by stress corrosion cracking. The stress arose from two sources: (1) a type of inherent stress known as residual stress; and (2) an operational stress that was imposed on the bellows metal as pressure was exerted on the walls by the expanding or contracting pipes. The corrosive agent was some chemical contaminant in WEPCO's steam, but neither party was able to identify the specific corrodent.

The central question which then arose was which party—the manufacturer or the buyer—should bear the loss caused by the failure of the Zallea bellows joints resulting from the presence of an unknown and unexpected corrodent in WEPCO's steam lines. The parties, having been unable to settle this question between themselves, entered the judicial arena for resolution of their controversy. Not too surprisingly, WEPCO asserted that Zallea, as the manufacturer, should bear the loss and brought suit under a variety of legal theories, including breach of express and implied warranties, negligence, and strict liability in tort. Zallea, in turn, claimed that WEPCO, as the producer of the steam, should have known of any corrosive contents therein and have revealed them if it desired the joints to be corrosion-proof. WEPCO claimed damages of $791,148 plus interest from the date of service of the complaint, representing the cost of purchase and installation of the slip joints that were substituted for the Zallea bellows joints, as well as several other items of expense. The district court found for Zallea on all claims presented, and WEPCO appeals.

On appeal, WEPCO challenges the district court's findings of fact and conclusions of law as to each of its various theories of liability raised at trial. WEPCO's asserted theories of recovery fall into two broad categories. First, WEPCO claims that, under contract law, Zallea expressly and impliedly warranted that its Monel bellows joints were fit for use in WEPCO's steam lines. Second, WEPCO claims that, as the manufacturer, Zallea had greater knowledge of how expansion joints would function in steam lines and of what chemicals or corrodents are reasonably likely to be present in such lines. WEPCO asserts that, in view of this knowledge, Zallea's failure to design its joints to withstand damage by such corrodents or to warn WEPCO of the possibility of damage renders Zallea liable under theories of warranty and strict liability in tort and negligence. The district court discussed each of these asserted bases of recovery in considerable detail; there-

fore, we shall touch on the theories of recovery only briefly before considering WEPCO's specific allegations of error with respect to the court's decision.

## II.

### A. WARRANTY CLAIMS

The court found that Zallea's price quotation letters were the offers forming the basis of the 1967 contract and that WEPCO's June 15, 1967 purchase order was the acceptance of those offers, forming a binding contract. A 1969 contract was substantially the same.

### 1. Express Warranty

On appeal, WEPCO argues that Zallea expressly warranted that the bellows joints furnished were "fit for use" in WEPCO's steam line. WEPCO's express warranty claims fall into two broad categories: those based on statements in Zallea's catalogue and those based on statements in the contract documents.

■ First, although the district court did not consider the question, WEPCO now argues that statements in Zallea's catalogue expressly warranted that Zallea's bellows would operate properly and adequately in a steam heating system, including systems containing chemical elements which could reasonably be expected to be present. WEPCO also argues that Zallea warranted by its statements in the catalogue that it had the expertise to advise customers on *all* aspects of use of its bellows. In support of these propositions, WEPCO cites a number of excerpts from the catalogue. For example, the catalogue contains the following statement about the type of joint purchased by WEPCO:

> "Zallea Self Equalizing Expansion Joints are ideal for application in long lines when there is considerable axial expansion and infrequent movement, such as

district heating lines which seldom cool down completely during the heating season."

Under § 402.313, Wis.Stat. (1977),[1] any affirmation of fact made by the seller relating to a particular item and which becomes a part of the basis of the bargain is an express warranty of fact. Statements contained in advertising and catalogues may create express or implied warranties. *See Filler v. Rayex Corp.*, 435 F.2d 336 (7th Cir. 1970); *Interco Inc. v. Randustrial Corp.*, 533 S.W.2d 257, 261 (Mo.App.1976).

■ However, the catalogue was not among the documents constituting the contract between WEPCO and Zallea; no evidence indicates that the catalogue statements were "part of the basis of the bargain". Wis.Stat. § 402.313 (1977). Moreover, excerpts from the catalogue not quoted by WEPCO expressly state that Zallea did not guarantee its joints against stress corrosion. For example, the catalogue states:

> "Corrosion is another factor which affects the life of an expansion joint, but because the exact corrosive conditions which will exist during operation can seldom be duplicated in the laboratory, it is impractical to estimate the life under corrosive conditions. Furthermore, since all expansion joints operate at high stresses, corrosion will be accelerated by such stresses."

WEPCO also contends that language in several of the contract documents created an express warranty. First, WEPCO claims that an express warranty arose from a statement in one of Zallea's price quotation letters: "We strongly recommend that Monel Bellows be utilized should chlorides be present in the steam." However, Zallea did not recommend Monel as being safe from all contaminants in the steam, only chlorides. This recommendation is not tan-

---

**1.** All statutory references are to sections of the Wisconsin Statutes, which are enactments of the Uniform Commercial Code. Wis.Stat. § 402.313(1)(a) (1977) reads:

> "*Express warranties by affirmation, promise, description, sample. (1)* Express warranties by the seller are created as follows:

> (a) Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise."

tamount to a warranty that Monel bellows would resist corrosion from all possible sources—including the unexpected elements present in WEPCO's steam which eventually caused stress corrosion cracking in the joints.

Further WEPCO claims that an express warranty was created by Zallea's letter to WEPCO dated May 18, 1967: "[S]hould the expansion joints be installed per our application recommendations, Zallea Brothers Inc. would guarantee the operation of the application as well as the recommended expansion joints". WEPCO contends that this statement was an express guarantee that the Monel joints were suitable for use in WEPCO's steam lines. The district court found:

> "As used in the context of the letter, the guarantee of the 'operation of the application' of the joints was not a flat guarantee that each joint would work; rather, it was a guarantee that the application scheme for the placement of joints recommended by Zallea would be adequate to absorb the expansions and contractions of the steam pipes. That letter's guarantee of the bellows joints themselves must likewise be given the proper scope by not interpreting it as rendering Zallea liable as an insurer against all possible problems." 443 F.Supp. at 951.

Given the fact that there were no general industry standards regarding acceptable steam quality and levels of chemicals and corrodents against which the performance of Zallea's bellows could be measured, we think the facts support the district court's interpretation of the "guarantee".

Finally, WEPCO relies on language in Zallea's original bid: "All expansion joints would be designed based on 5,000 complete thermal cycles". WEPCO claims that this statement was an express warranty that the joints would endure 5,000 operational cycles in WEPCO's steam line. However, the record shows that the 5,000 cycles referred to relate to laboratory tests for fatigue failure rather than resistance to stress corrosion. Moreover, the joints were, in fact, designed to meet the 5,000 cycle design parameter.

In short, we agree with the reasoning and conclusions of the district court that Zallea gave no express warranty.

2. *Implied Warranty*

WEPCO argues that an implied warranty of fitness for a particular purpose arose under the contract. Section 402.315, Wis.Stat. (1977),[2] provides that an implied warranty of fitness for a particular purpose arises only where the seller has reason to know of a particular purpose for which the product is required and that the buyer is relying on the seller to furnish suitable goods. Applying the requirements of § 402.315, the district court found that no implied warranty was given in the instant case:

> "[T]he record does not indicate that Zallea knew that a strong resistance to corrosion was a particular purpose for which the bellows joints were required. Moreover, no information was communicated by WEPCO to Zallea and no special circumstances existed to inform Zallea that WEPCO was relying on Zallea to choose a corrosion resistant material." 443 F.Supp. at 950.

On appeal, WEPCO's primary contention is that the trial court incorrectly defined WEPCO's "particular purpose" in ordering the Monel bellows. Basically, WEPCO claims that the district court confused the concept of "warranty of merchantability" under § 402.314, Wis.Stat. (1977),[3] with that

---

2. Wis.Stat. § 402.315 (1977) reads:

"*Implied warranty: fitness for particular purpose.* Where the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is unless excluded or modified under s. 402.316 an implied warranty that the goods shall be fit for such purpose."

3. Wis.Stat. § 402.314(1) (1977) reads:

"*Implied warranty: merchantability; usage of trade.* (1) Unless excluded or modified (s. 402.316), a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind. . . ."

of "warranty of fitness for a particular purpose" under § 402.315, Wis.Stat. (1977). Consequently, the district court defined WEPCO's particular purpose in ordering the Monel joints too narrowly. WEPCO claims that, under a proper interpretation of the statute, the particular purpose for which the Monel joints had to be suited was not a "strong resistance to corrosion" but rather use in WEPCO's steam line.

Corrosion resistance was not a *purpose* for which the joints were required but instead a desired *characteristic* of the joints. The important question is not what *degree* of resistance to corrosion was required but whether the joints were required to resist corrosion from all unknown corrodents in WEPCO's steam.

Comment 2 of the Official Comments to UCC § 2–315 defines a "particular purpose" as follows:

"2. A 'particular purpose' differs from the ordinary purpose for which the goods are used in that it envisages a specific use by the buyer which is peculiar to the nature of his business whereas the ordinary purpose for which goods are used are those envisaged in the concept of merchantability and go to uses which are customarily made of the goods in question. For example, shoes are generally used for the purpose of walking upon ordinary ground, but a seller may know that a particular pair was selected to be used for climbing mountains."

To paraphrase the Official Comment, bellows type expansion joints are generally used for the purpose of allowing steam pipes to expand and contract with the flow of steam. The question is whether Zallea "had reason to know" that its joints were to be used in pipes which carried steam containing unknown corrosive chemicals. The trial court found in the negative.

WEPCO's basic argument is that because Zallea knew that the joints were to be used in WEPCO's steam lines, Zallea reasonably should have expected that certain chemical elements would be present in the steam and

designed its joints accordingly. To prove Zallea's knowledge, WEPCO relies on Zallea's statement in its price quotation letter: "We strongly recommend that Monel Bellows be utilized should chloride be present in the steam". While this statement does indicate that Zallea knew that WEPCO would be concerned about possible corrosion, it does not show that Zallea was aware that WEPCO required the joints to resist corrosion from unexpected contaminants in the steam other than chloride. WEPCO also contends that a report received by Zallea in January, 1967, from the Lehigh Testing Laboratories, should have alerted Zallea that a strong resistance to corrosion by unknown elements, particularly sulfites, was a particular purpose for which the bellows were required. The subject of the Lehigh Report was a Zallea bellows expansion joint which failed in another customer's steam line; the Report noted that the customer used sulfite and caustic to treat its boiler water. While the report indicated that boiler carryover initiated the corrosion, it stated that the corrosive substance was unknown. The report read as follows:

"CONCLUSION. The examination of the failed bellows section, as discussed above, indicates, in our opinion, that the metal had been subjected to an unknown corrosive substance. This, in conjunction with the stresses of the normal operation of the expansion joint, caused its ultimate failure."

However, we do not believe that Zallea should have concluded from this report that sulfite or other contaminants might be present in steam from another plant, such as WEPCO's.

The evidence does not show that Zallea had "reason to know" of the presence of the unexpected corrodents in WEPCO's steam lines. There existed no general industry standards for gauging the quality of steam generated by electrical utilities. Thus, there was no level of chemicals or corrodents which Zallea reasonably could have anticipated. Nor did WEPCO give any information in its specifications as to the ac-

tual quality and contents of its steam. Additionally, as to the second part of the § 402.315 test, the circumstances surrounding the parties' transactions (including, but not limited to, WEPCO's lack of communication of reliance to Zallea) were not such that Zallea should have known that WEPCO was relying on it to select an appropriate metal for the steam in WEPCO's pipes. For these reasons, we agree with the district court that no implied warranty of fitness for a particular purpose arose.

## B. *DEFECTIVE DESIGN*

WEPCO's second major claim is that the design of Zallea's joints was defective under warranty and strict liability principles.

WEPCO bases its warranty claim on language contained in the WEPCO purchase order (the acceptance): "The Seller [Zallea] warrants that all articles covered by this order will be in strict accordance with the specifications and drawings or other descriptions furnished by the Buyer and free from defects in materials and workmanship". As noted by the district court, this warranty was part of the contract between the parties. *See* § 402.207, Wis.Stat. (1977). WEPCO claims that Zallea breached the warranty of freedom from defects by selling bellows that were defectively designed in three respects: (1) Zallea failed to submit the joints to an annealing process; (2) Zallea used a liner inside the joints which allegedly facilitated corrosion by increasing condensation; and (3) Zallea failed to use a thicker metal. The district judge considered at length these alleged design "defects" and concluded that the bellows were not defectively designed. More than sufficient evidence supports his finding and thus, we will rest on his detailed discussion of these claims relating to problems of technical design. WEPCO relies on these same allegations of defect to support its claim of strict liability in tort. This claim also must fail, as WEPCO has failed to make the primary showing that any defect in the design of the joints rendered them unreasonably dangerous.

We would like to dispose quickly of a few other issues raised by WEPCO on appeal. First, WEPCO contends that the trial court erred when it considered the customs in the industry on the question of whether the joints were defective because industry practices are "irrelevant". However, evidence of industry practice is admissible in Wisconsin at the trial court's discretion. *See Chart v. General Motors Corp.*, 80 Wis.2d 91, 258 N.W.2d 680 (1977), and the cases cited therein. Here the trial judge acted well within the scope of his discretion. Additionally, WEPCO claims that the district court erred in failing to consider the possibility that the combined effect of annealing the joints and increasing their thicknesses would have prevented the failures. However, even if increased wall thickness in combination with annealing would have prevented the stress corrosion cracking, Zallea was not obligated under either tort or contract law to take all conceivable steps to prevent failure of the joints.

## C. *FAILURE TO WARN*

WEPCO's final claim is that Zallea's failure to warn WEPCO that the Monel bellows were susceptible to stress corrosion cracking in the presence of sulfur or sodium hydroxide constituted a defect under strict liability in tort and negligence. WEPCO contends that Zallea, having undertaken to advise WEPCO to use Monel, had a duty to warn WEPCO of the peculiarities of Monel of which Zallea was aware and which Zallea had reason to believe would be relevant to Monel's use. *See* Wisconsin Jury Instructions—Civil 3262—Strict Liability: Duty of Manufacturer (Supplier) to Warn. Central to WEPCO's claim is the assertion that, as a result of the Lehigh Report, Zallea had reason to know of the corrosive elements in WEPCO's steam. As we noted earlier, the Lehigh Report was insufficient to pin knowledge on Zallea that sodium sulfite and caustic would be present in WEPCO's steam line. As Zallea was not aware and could not reasonably be expected to have been aware of the likelihood that its joints would be subject to unexpected contami-

**704**

nants in WEPCO's steam, Zallea could not have warned WEPCO of any danger. Further, the evidence shows that WEPCO officials were aware of stress corrosion cracking problems associated with bellows joints. However, because the bellows joints were less expensive to install and maintain than more reliable types of expansion joints, they decided to purchase the bellows joints despite the possibility of stress corrosion cracking. Under these circumstances, WEPCO cannot now complain that it required a warning regarding the possibility of failure of the bellows joints.

### III.

In conclusion, we believe the district judge gave an excellent synopsis of the equities in this case:

"In the circumstances of this case, imposition of such liability upon Zallea is unwarranted. In this case the situation is such that there simply were no general standards of steam quality and of levels of chemicals or corrodents which Zallea reasonably could have anticipated. The evidence does not support the conclusion that Zallea did have or should have had knowledge of the likelihood of the joint failures sufficient to justify imposing liability upon Zallea. The evidence supports a finding that WEPCO was in a position to have superior knowledge of the actual quality and contents of its steam, i. e., the levels of chemicals or corrodents in the steam, and to have the expertise and access to knowledge concerning the steam in its pipes. Since there were no general industry standards regarding acceptable steam quality and levels of chemicals or corrodents in light of which Zallea could have designed the expansion joints or issued warnings, and since WEPCO was in a better position to evaluate its own steam quality and chemical or corrodent levels, the loss for the still unexplained failures must fall upon WEPCO rather than Zallea." 454 F.Supp. at 38.

Accordingly, the judgment is affirmed.