**JOS. SCHLITZ BREWING CO., a Wisconsin corporation, Plaintiff-Appellant,**

**v.**

**TRANSCON LINES, a California corporation, Defendant-Appellee.**

**No. 83–2196.**

United States Court of Appeals, Seventh Circuit.

Argued May 29, 1984.

Decided March 20, 1985.

Rehearing and Rehearing En Banc Denied May 8, 1985.

Robert H. Friebert, Friebert, Finerty & St. John, Milwaukee, Wis., for plaintiff-appellant.

Christopher Ashworth, Garfield, Tepper & Ashworth, Los Angeles, Cal., for defendant-appellee.

Before POSNER and FLAUM, Circuit Judges, and CAMPBELL, Senior District Judge.[*]

WILLIAM J. CAMPBELL, Senior District Judge.

Plaintiff, Jos. Schlitz Brewing Company, filed a complaint in district court under 49 U.S.C. § 11707, the Carmack Amendment, seeking compensation for cargo damage caused to a shipment of empty beer cans.

* The Honorable William J. Campbell, Senior District Judge of the Northern District of Illinois, is sitting by designation.

The cans had been shipped by the defendant motor carrier, Transcon Lines, from Memphis, Tennessee to Van Nuys, California. Some of the cans were dented or crushed in transit and the defendant's liability for that portion of the cargo damage is not at issue on this appeal.[1] The remainder of the shipment was rendered unusable due to fiber contamination and the resulting loss was valued at approximately $235,000. After a non-jury trial, the district court determined that the defendant was not liable for that damage. 571 F.Supp. 52. Schlitz challenges that conclusion, claiming that the district court erred in its allocation of the burden of proof.

The material facts as found by the district court are not in dispute. The appellant operated breweries at various locations in the country and had its own Container Division to manufacture cans and bottles. However, Schlitz did not rely solely on its own Container Division. For example, in Memphis the American Can Company operated a manufacturing plant adjacent to the Schlitz facility that supplied cans directly to the brewery. In May 1977, the employees in appellant's Container Division went on strike. The breweries were still operating, however, and Schlitz had to make arrangements to provide cans for the beer that was still being produced. The appellant contracted with the American Can Company to increase its production of cans at the Memphis facility and then made plans to transport those cans to its other breweries. Schlitz arranged with the Southern Pacific Railroad to ship 10 million steel cans, labeled "Schlitz", to Van Nuys, California. Appellant also contracted with the defendant for the shipment of 3.1 million cans, labeled "Old Milwaukee", by motor carrier to the same destination.

When shipping empty cans the industry practice is to stack them vertically with the opening at the top and to separate the layers of cans with chipboard separators. The cans are stacked on pallets, braced with bands, and wrapped in cardboard shrouds and placed in the trailer or railroad car by the use of forklifts. This method is used throughout the industry even though it is inevitable that fiber dust will be generated as a result of the friction between the open tops of the cans and the chipboard separators. While the resulting dust is not desirable, it can be rinsed out prior to the filling of the cans and, therefore, this means of transporting cans is not impractical.

Schlitz utilized the method of packing cans described above in preparing the cargo for shipment to Van Nuys. The pallets to be sent were chosen at random from the cans produced by the American Can Company in Memphis (the other pallets were either shipped to other breweries or put into production at Memphis).

When Schlitz originally provided Transcon with the shipping instructions for its cans, it directed that 45-foot trailers with swing-out doors be utilized. Thereafter, James McNeer, manager of defendant's Memphis terminal, telephoned Ted Thurmon, inventory control coordinator at Schlitz's Memphis brewery, regarding the shipment. He asked whether 27-foot "pup" trailers could be used to ship the cans. This arrangement would be favorable to Transcon because it could transport the "pup" trailers in tandem from Arkansas to California thereby lowering its expenses. Mr. Thurmon stated, however, that the smaller trailers would be unsatisfactory. Thereafter, Mr. McNeer did in fact send twenty-four 45-foot trailers to the Memphis brewery to pick up the shipment of cans.

During the period between May 17 through May 21, 1977, approximately 3.1 million cans were loaded by Schlitz's personnel onto the trailers. The appellant had instructed its employees to take extra precautions to prevent losses on these shipments. Each trailer was loaded with eighteen pallets, the first two pallets being placed directly against the front wall of each trailer and the other pallets placed snuggly behind them. After loading each

---

1. A judgment in the amount of $3,000 was entered against Transcon as to that damage.

trailer, a small space at the rear was left empty and so two-by-four's were nailed to the floor directly behind the last pallets to brace them. Corrugated cardboard shrouds were placed along the sides of the palletized loads to guard against cans falling out during shipment.

After the loading, however, Transcon did not transport the cans directly to Van Nuys. Instead, the trailers were driven ten miles to defendant's West Memphis, Arkansas terminal. There Transcon employees were directed to unload the cargo and to transfer it to "pup" trailers. The reloading of the cargo was not performed with the same care as the original loading. The cardboard shrouds became detached and many of the pallets loosened. As a result, cans fell off the pallets. In only a few of the "pup" trailers were the pallets braced in any manner at all. In the space at the rear of the trailers, Transcon also added miscellaneous cargo from other shippers. The cans were then transported 1,800 miles to Van Nuys.

Upon arrival at the Schlitz brewery, plaintiff's employees found a great number of loose cans in the trailers. Furthermore, it was, of course, obvious that Transcon had not complied with Schlitz's instructions regarding the use of trailers. All of the cans were eventually transferred to a nearby warehouse and Transcon was notified that Schlitz intended to file a claim for cargo damage. It was subsequently determined that 60,000 cans were dented or crushed. More importantly, the entire load was contaminated with fibers from the chipboard separators. Schlitz's personnel testified that they had never observed a shipment of cans which contained such a large amount of fiber dust. The normal rinsing techniques were ineffective to remove the dust from the cans. For some reason, many of the fibers adhered to the enamel lining in the interior of the cans,

thus rendering them unusable.[2] Schlitz eventually had to sell the cans for scrap and suffered a loss valued at $234,408.42.

At trial the plaintiff presented the *prima facie* case required by the Carmack Amendment. It submitted evidence that the cans were delivered to the carrier in good condition, they arrived at the destination in a damaged condition, and that a specific monetary loss resulted, *see Missouri Pacific Railroad v. Elmore and Stahl*, 377 U.S. 134, 84 S.Ct. 1142, 12 L.Ed.2d 194 (1964). The trial judge specifically ruled that the plaintiff successfully carried its burden as to the elements of the *prima facie* case and that conclusion is not challenged on appeal. Under the Carmack Amendment, the burden then shifted to the defendant to demonstrate that it was free from negligence and that the damage was caused by (a) an act of God; (b) a public enemy; (c) an act of the shipper; (d) a public authority; or (e) an inherent vice or nature of the goods, *see Martin Imports v. Courier-Newson Express, Inc.*, 580 F.2d 240, 242 (7th Cir.1978), *cert. den.* 439 U.S. 983, 99 S.Ct. 574, 58 L.Ed.2d 655 (1978), *citing Missouri Pacific Railroad, supra,* 377 U.S. at 137, 84 S.Ct. at 1144. Transcon's defense was that the cans were delivered to it in a defective condition. This was based on the expert testimony of Dr. Vandermeerssche. He stated that in fifty percent of the cans he examined from the Memphis to Van Nuys shipment the enamel coating contained imperfections and bubbles. His theory was that the chipboard fibers could not be rinsed out because of the surface tension resulting from the imperfections in the enamel. The plaintiff rebutted this testimony with its experts who testified that the bubbles and unevenness were not related to the adhesion of the chipboard fibers. Furthermore, the fact that the cans were chosen randomly from the ones produced in Memphis and

---

**2.** There is much discussion in the briefs over whether the problem was the adhesion of chipboard fibers to the enamel or the inability of Schlitz's rinsing techniques to cleanse the cans. This argument is similar to the age-old conundrum, "Which came first, the chicken or the egg?" Schlitz demonstrated that the cans were undamaged in Memphis and it was stipulated that they arrived in Van Nuys in an unusable condition. For purposes of this opinion, further analysis is unnecessary.

that none of the other cans suffered from fiber contamination weighed against Dr. Vandermeerssche's explanation.

In its Findings of Fact the Court rejected Dr. Vandermeerssche's theory because his sampling of the cans was not statistically significant. However, the district court did not accept the plaintiff's theory of the fiber contamination either. Dr. Himmelfarb, plaintiff's expert, testified that the vibration caused by the defendant's unloading and reloading of the cans and its failure properly to brace the pallets generated an excessive amount of the chipboard dust as well as fibers of above-average size. He stated that when the fibers absorbed moisture they would adhere to the enamel lining of the cans. The Court rejected plaintiff's theory, stating simply that "it was speculative and untested." The trial judge concluded that "the reason the fiber dust could not be economically removed from the cans has not been shown."

However, the trial judge did accept two statements of Dr. Vandermeerssche: (1) that fiber dust is generated by any movement of the pallets; and (2) that the number of fiber particles produced would bear a roughly linear relationship to the distance traveled and that beyond some threshold distance the size of the particles would increase. The district judge concluded that the defendant had carried its burden of demonstrating that the damage resulted from the inherent nature of the goods as packaged by Schlitz. He noted that the plaintiff made the decision to pack the cans with chipboard separators knowing that fiber dust would be generated. The Court concluded:

> To meet its burden of proof, it is not necessary that the defendant prove the exact reason why the chipboard fibers could not be removed from the cans. It is sufficient that the defendant show that the various factors which possibly contributed to the problem were within the control and exclusive knowledge of the shipper, *Cf. Wisconsin Electric Power Company v. Zallea Brothers, Inc.,* 606 F.2d 697 (7th Cir.1979).

Based on this reasoning, the district court denied plaintiff relief as to the fiber contaminated cans.

Appellant claims that the trial judge erred in concluding that Transcon had satisfied its burden of demonstrating that it was not negligent and that the inherent nature of the goods was the sole cause of the damage. We must agree.

We begin by noting that it is undisputed that Schlitz satisfactorily presented a *prima facie* case. That showing created a presumption of negligence as to Transcon, *Plough, Inc. v. Mason and Dixon Lines,* 630 F.2d 468 (6th Cir.1980). Even beyond that presumption there was substantial evidence of negligent conduct on the part of the defendant: the direct disobedience of an instruction from the shipper, the unnecessary unloading and reloading, the lack of bracing of the cargo, and the inclusion of additional cargo. Furthermore, there are relevant areas of inquiry to which the defendant provided no evidence. Transcon offered no testimony of any of the truck drivers as to the treatment of the cargo between West Memphis and Van Nuys. Furthermore, there was no evidence offered as to the nature of the additional cargo which was put in the rear of the trailers.

The trial court stated: "Except for providing the normal vibrations that result from transportation, Transcon had no control over any of the factors that might have played a role in the contamination problem." However, Transcon provided more than "normal vibrations" as a result of the unnecessary unloading and reloading as well as its failure to brace the loads. Furthermore, it is difficult to accept the conclusion that Transcon had no control over the factors relating to the fiber contamination when the cause of the fiber adhesion was never determined.

We also cannot accept the conclusion that Transcon demonstrated by a preponderance of the evidence that the sole cause of the damage was the inherent vice or nature of the goods. It is undisputed that the use of chipboard separators between

layers of cans was standard operating procedure in the industry. Furthermore, none of the experts who testified could recall a fiber adhesion problem ever occurring before to Schlitz or any other shipper. The fact that the rail shipment of cans arrived in satisfactory condition also weighs against the conclusion of an inherent vice. Appellee suggests that there is insufficient evidence to justify a comparison between the two shipments. We disagree. The testimony was uncontroverted that the cans were of the identical type (only the logo was different), were packed in the same manner in pallets with chipboard separators, and traveled the same distance. The only significant distinction is that the cans in the rail shipment were not subjected to unnecessary unloading and reloading and were properly braced. The comparison between the two shipments is rendered even more probative by the fact that the experts unanimously agreed that rail transportation is more traumatic to the cargo than truck transportation. Appellee argues that there was no testimony regarding the extent of fiber dust generated by that rail shipment. However, it was undisputed that those cans were put into production by Schlitz and the cans shipped by Transcon were stipulated to be unusable upon arrival.

Our conclusion that the district court erred in applying the burden of proof imposed on Transcon by the Carmack Amendment is buttressed by its reliance on *Zallea Brothers, supra,* 606 F.2d 697. In that case the plaintiff sued a pipe manufacturer for delivering allegedly defective steam pipes. The complaint alleged various breaches of warranties, strict liability and negligence. The pipes had developed cracks as the result of stress corrosion and, as in this case, neither party could demonstrate the exact cause of the damage because the corrosive agent could not be identified. After a non-jury trial, the district judge ruled for the defendant as to all claims and the judgment was affirmed on appeal. This Court quoted extensively from the trial court's opinion as "an excellent synopsis of the equities in this case:"

"In the circumstances of this case, imposition of such liability upon Zallea [the defendant] is unwarranted. In this case the situation is such that there simply were no general standards of steam quality and of levels of chemicals or corrodents which Zallea reasonably could have anticipated. The evidence does not support the conclusion that Zallea did have or should have had knowledge of the likelihood of the joint failures sufficient to justify imposing liability upon Zallea. The evidence supports a finding that WEPCO [the plaintiff] was in a position to have superior knowledge of the actual quality and contents of its steam, i.e., the levels of chemicals or corrodents in the steam, and to have the expertise and access to knowledge concerning the steam in its pipes. Since there were no general industry standards regarding acceptable steam quality and levels of chemicals or corrodents in light of which Zallea could have designed the expansion joints or issued warnings, and since WEPCO was in a better position to evaluate its own steam quality and chemical or corrodent levels, the loss for the still unexplained failures must fall upon WEPCO rather than Zallea." 606 F.2d at 704 *quoting Zallea Brothers,* 454 F.Supp. 36, 38 (E.D.Wis.1978).

Of course, the major distinction between *Zallea Brothers* and this case is that it was a typical civil action in which the burden of proof was on the plaintiff as to all claims. Under the Carmack Amendment the burden was on the defendant Transcon to demonstrate that it had not been negligent and that the damage was caused by an inherent defect in the cargo. Furthermore, as to the equities in this case, Congress considered them when it drafted the legislation and the courts are thereby limited in their analysis of those concerns. Nonetheless, we do not find the equities of this case to be similar to those in *Zallea Brothers.* Here, Transcon was clearly negligent in the handling of the cargo. In light of the lack of evidence as to the treatment of the cargo between West Memphis and Van

Nuys and the nature of the additional cargo, the inability to prove the causal element cannot be attributed solely to Schlitz. One of the reasons for placing the burden of proof as to negligence on the carrier is that it has the superior, if not the exclusive, means to demonstrate the causal factors, *Galveston, Harrisburg & San Antonio R. Co. v. Wallace*, 223 U.S. 481, 492, 32 S.Ct. 205, 207, 56 L.Ed. 516 (1911). Thus, one court has stated:

The phrase "caused by" in the Amendment has been interpreted to mean that a common carrier is liable for all losses which occurred while the goods were being transported by it, unless the carrier can demonstrate it is free from fault. *United States v. Central of Georgia Railway Co.*, 411 F.Supp. 1023, 1026 (E.D.Tenn.1976) [Citations omitted.]

Therefore, we conclude that the defendant Transcon did not carry its burden of proof as to negligence or the inherent vice defense. Accordingly, the judgment of the district court is reversed.