**SWIFT–ECKRICH, INC., Plaintiff,**

v.

**ADVANTAGE SYSTEMS, INC. and D & S Trucking, Inc., Defendant.**

**No. 97–4077–SAC.**

United States District Court, D. Kansas.

June 8, 1999.

---

John H. Stauffer, Jr., Goodell, Stratton, Edmonds & Palmer, Topeka, KS, Peter A. Greene, Thompson, Hine & Flory, Washington, DC, for Swift-Eckrich Inc.

Justice B. King, Fisher, Patterson, Sayler & Smith, Topeka, KS, Ryan E. Karaim, Franke & Schultz, P.C., Kansas City, MO, Thomas R. Buchanan, McDowell, Rice, Smith & Gaar, Kansas City, MO, for Advantage Systems Inc.

Ryan E. Karaim, Franke & Schultz, P.C., Kansas City, MO, John L. Mullen, Franke & Schultz, P.C., Kansas City, MO, for D & S Trucking Inc.

## MEMORANDUM AND ORDER

CROW, Senior District Judge.

On April 21, 1997, Swift–Eckrich, Inc., a Delaware corporation engaged in the distribution of food products, commenced this action under 49 U.S.C. § 14706[1] against

---

**1.** Title 28, section 1337, titled "Commerce and antitrust regulations; amount in controversy, costs" provides in pertinent part:

(a) The district courts shall have original jurisdiction of any civil action or proceeding arising under any Act of Congress regu-

Advantage Systems, Inc. and D & S Trucking, Inc. Swift–Eckrich hired Advantage Systems to transport its products. Advantage Systems apparently is a transportation broker who engaged the services of trucking companies to actually haul the cargo. On June 20, 1996, Advantage Systems accepted a shipment from Co–Pack Foods, Inc. in Iowa for delivery to a refrigerated storage facility in Kansas. The shipment consisted of 2260 cases of turkey, ham and bologna which required refrigeration at 22 degrees during transportation. Advantage Systems engaged the services of D & S to transport the meat. Swift–Eckrich's complaint alleges that when the shipment arrived in Kansas on June 21, 1996, the temperature of the meats ranged between 52 and 65 degrees. Swift–Eckrich's complaint alleges that the failure to maintain the temperature of the meats at 22 degrees while in transit rendered the shipment worthless for their intended purpose of human consumption. Swift–Eckrich seeks total damages in the amount of $26,032.79.

Both defendants contest Swift–Eckrich's claims, arguing that the shipment was not damaged as alleged. Advantage Systems asserts a counterclaim against Swift–Eckrich for $9,103.80 it has not paid Advantage Systems for the shipment of other products. Advantage Systems also asserted a crossclaim against D & S, essentially aiming that D & S is contractually obligated to defend and indemnify it for any losses incurred in this case. That crossclaim has since been resolved.[2]

This case comes before the court upon the following motions:

1. Swift–Eckrich's "Motion for Enforcement of Settlement Agreement" (Dk.47).

2. Swift–Eckrich's "Motion for Summary Judgment" (Dk. 37).

## 1. Swift–Eckrich's "Motion for Enforcement of Settlement Agreement" (Dk.47).

According to Swift–Eckrich and D & S, all parties reached an agreement which not only settled Swift–Eckrich's claim for damages, but also closed this case as Advantage Systems agreed to the dismissal of its counterclaim against Swift–Eckrich without prejudice. Advantage Systems responds, arguing that it never authorized its attorney to settle the case in a manner that would permit Swift–Eckrich to setoff the claim it asserts in this case against any other claim asserted by D & S.

### Legal Standards

 "A trial court has the power to summarily enforce a settlement agreement entered into by the litigants while the litigation is pending before it." *United States v. Hardage,* 982 F.2d 1491, 1496 (10th Cir.1993). " 'Once it is shown that an attorney has entered into an agreement to settle a case, a party who denies that the attorney was authorized to enter into the settlement has the burden to prove that authorization was not given.' " *Trujillo v. State of New Mexico,* 172 F.3d 63, 1999 WL 63885, *2 (10th Cir.1999) (*quoting Turner v. Burlington N. R. Co.,* 771

lating commerce or protecting trade and commerce against restraints and monopolies: Provided, however, That the district courts shall have original jurisdiction of an action brought under section 11706 or 14706 of title 49, only if the matter in controversy for each receipt or bill of lading exceeds $10,000, exclusive of interest and costs.

**2.** The contract between Advantage Systems and D & S apparently includes an indemnification clause in which D & S agreed to indemnify Advantage Systems for any claim

arising out of damaged shipments. D & S, through its insurer, agrees to defend Advantage Systems in this action and to indemnify Swift–Eckrich for any damages Swift–Eckrich recovers in this action. Consequently, the cross-claim between Advantage Systems and D & S has been settled. *See* "Withdrawal of Crossclaim" (Dk.31).

Since D & S agreed to defend this case, the attorneys originally hired by Advantage Systems have withdrawn. After that time D & S's attorney also represented Advantage Systems.

F.2d 341, 345–46 (8th Cir.1985)). Whether the party has met its burden is a question of fact. *Id.* "Whether an evidentiary hearing is required to resolve material facts concerning the existence or terms of a settlement agreement is to be determined on a case-by-case basis." *Johnson v. Landmark Plaza, Ltd.*, 16 F.3d 416, 1994 WL 36773 (10th Cir.1994) (Table).

 "Questions regarding the enforceability or validity of ... [settlement] agreements are determined by federal law—at least where the substantive rights and liabilities of the parties derive from federal law." *Mid–South Towing Co. v. Har–Win, Inc.*, 733 F.2d 386, 389 (5th Cir.1984); *see Petition of Mal de Mer Fisheries, Inc.*, 884 F.Supp. 635, 639 n. 4 (D.Mass.1995) ("Federal law applies to the issue of an attorney's authority to settle a civil action brought under federal law.") (*citing Michaud v. Michaud*, 932 F.2d 77, 80 n. 3 (1st Cir.1991)). *See also Snider v. Circle K Corp.*, 923 F.2d 1404, 1407 (10th Cir.1991) (applying federal common law to Title VII settlement agreement).

 "Settlement agreements are a type of contract and are therefore governed by contract law." *Bamerilease Capital Corp. v. Nearburg*, 958 F.2d 150, 152 (6th Cir.), *cert. denied*, 506 U.S. 867, 113 S.Ct. 194, 121 L.Ed.2d 137 (1992). "A district court does not have the power to impose a settlement agreement when there was never a meeting of the minds." *Wang Laboratories, Inc. v. Applied Computer Sciences, Inc.*, 958 F.2d 355, 359 (Fed.Cir. 1992) (*citing Ozyagcilar v. Davis*, 701 F.2d 306, 308 (4th Cir.1983)). Nor does the court have "the power to make an agreement for the parties or to decide, contrary to the facts and the law, that a draft settlement agreement was binding when the parties did not agree on it." *Id.*

 "It is fundamental that an attorney does not by reason of his employment have authority to compromise his client's cause of action absent an emergency requiring prompt action." *Hayes v. Eagle-*

*Picher Industries, Inc.*, 513 F.2d 892, 893 (10th Cir.1975). "[W]here clients unequivocally repudiate an unauthorized agreement immediately after learning of it (and this means a few days or reasonable time), the compromises are to be set aside." *Id.* at 894.

### Analysis

 Although the court always encourages the parties to settle their disputes on mutually agreeable terms, in this case it does not appear that all parties agreed to all of the essential terms of the purported settlement agreement. The court agrees that the proposed settlement would, in essence, permit Swift–Eckrich to setoff the claim it asserts in this case against Advantage Systems' claim for $9,103.80 in any subsequent litigation. Advantage Systems did not assent to that material provision of the settlement agreement and has apparently consistently taken that position since learning of the purported settlement. Consequently, the court does not believe that there was ever a meeting of the minds on all of the essential terms of the settlement agreement and that it would be improper to hold Advantage Systems to an agreement it did not make.

Based upon its review of the materials provided by the parties, the court does not believe that an evidentiary hearing would serve any meaningful purpose. The court denies Swift–Eckrich's "Motion for Enforcement of Settlement Agreement" (Dk.47).

**2. Swift–Eckrich's "Motion for Summary Judgment" (Dk.37).**

Swift–Eckrich seeks summary judgment on its claim against Advantage Systems and D & S, arguing that no genuine issue of material fact precluding summary judgment exists. The defendants respond, arguing that genuine issues of material fact preclude summary judgment. The defendants also note that Swift–Eckrich has not complied with the requirements of D.Kan. Rule 56.1. Nevertheless, the defendants

respond to the essential points raised in Swift–Eckrich's motion. Swift–Eckrich did not file a reply.

## Liability of the Common Carrier

■ "The Carmack Amendment to the Interstate Commerce Act imposes liability for nondelivery of goods on " 'carriers' " and " 'freight forwarders.' " *Chemsource, Inc. v. Hub Group, Inc.*, 106 F.3d 1358, 1361 (7th Cir.1997) (*quoting* 49 U.S.C. §§ 14706, 13102(3) and (8)).

The Carmack Amendment has been interpreted by the Supreme Court and this Court to provide that "a common carrier is liable for all losses which occurred while the goods were being transported by it, unless the carrier can demonstrate it is free from fault." *See Jos. Schlitz Brewing Co. v. Transcon Lines*, 757 F.2d 171, 176 (7th Cir.1985), *certiorari denied*, 474 U.S. 848, 106 S.Ct. 143, 88 L.Ed.2d 118. In order to recover damages under the Carmack Amendment, a plaintiff must first establish a prima facie case by providing evidence that (i) the goods in question had been delivered to the carrier in good condition; (ii) the goods had arrived at the final destination in a damaged or diminished condition; and (iii) the damages can be specified. *See Missouri Pacific Railroad Co. v. Elmore & Stahl*, 377 U.S. 134, 138, 84 S.Ct. 1142, 1144–1145, 12 L.Ed.2d 194; *Schlitz*, 757 F.2d at 173; *S.C. Johnson & Son, Inc. v. Louisville & Nashville Railroad Co.*, 695 F.2d 253, 256 (7th Cir.1982). Once the plaintiff has satisfied these requirements, the defendant carrier will be liable for damage to the goods in question, unless it can show that it was free from negligence and that the damage was caused by "(a) the act of God; (b) the public enemy; (c) the act of the shipper himself; (d) public authority; (e) or the inherent vice or nature of the goods." *Missouri Pacific*, 377 U.S. at 137, 84 S.Ct. at 1144 (citations omitted); *Schlitz*, 757 F.2d at 173; *S.C. Johnson*, 695 F.2d at 256.

*Pharma Bio, Inc. v. TNT Holland Motor Exp., Inc.*, 102 F.3d 914, 916 (7th Cir. 1996).

## D.Kan. 56.1

The court agrees that Swift–Eckrich's motion for summary judgment does not comply with the requirements of D.Kan. 56.1. Among other transgressions, Swift–Eckrich has not set forth its statement of uncontroverted facts in separately numbered paragraphs. D.Kan. Rule 56.1 is not merely an advisory recommendation regarding the manner in which summary judgment motions should be prepared. Its requirements embody a set of rules proven by time and experience to benefit both the court and the parties in the disposition of summary judgment motions. In the past, a party's failure to comply with the minimal requirements imposed by D.Kan. Rule 56.1 has sometimes prejudiced their respective position. *See, e.g., Kelly v. City of Topeka*, No. 97–4079–SAC, 1998 WL 982902, *1 (D.Kan. Sept.23, 1998) ("Kelly's 'response' brief falls far short of satisfying the requirements imposed by Fed.R.Civ.P. 56 and D.Kan. Rule 56.1. In fact, the defendant makes no effort to specifically controvert any of the City's statements, nor does his response contain any citation to the record or to any materials which might raise a genuine issue of material fact precluding summary judgment. *See* Fed. R.Civ.P. 56(e); D.Kan. Rule 56.1. Under D.Kan. Rule 56.1, the City's statement of facts is deemed admitted. As those facts clearly demonstrate the absence of any discrimination on the basis of race, the City is entitled to summary judgment.") (footnotes omitted).

Although the court does not countenance Swift–Eckrich's failure to comply with the requirements of Rule 56.1, that failure has not prejudiced or ostensibly confused the defendants who respond to the essential points presented by Swift–Eckrich's motion. Given the narrow issues presented, and simply in the interests of expediency, the court will not strike the plaintiff's motion for summary judgment and will pro-

ceed to the merits. In the future, the court trusts that counsel for the plaintiff will endeavor to comply with the requirements of this court's local rules.

### Hearsay

■■■ Fed.R.Evid. 801(c) defines hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." "Hearsay is not admissible at trial, except as provided by the Federal Rules of Evidence or other statutory authority." *United States v. Cass*, 127 F.3d 1218, 1222 (10th Cir.1997) (citing Fed.R.Evid. 802), *cert. denied*, — U.S. ——, 118 S.Ct. 1101, 140 L.Ed.2d 155 (1998).

■■■ Although the party opposing summary judgment "need not produce evidence in a form that would be admissible at trial, . . . the content or substance of the evidence must be admissible." *Thomas v. IBM*, 48 F.3d 478, 485 (10th Cir.1995) (citations omitted). "Evidence premised on inadmissible hearsay 'is not suitable grist for the summary judgment mill.'" *Walker v. Runyon*, 979 F.Supp. 1363, 1368 (D.Kan. 1997) (*quoting Thomas*, 48 F.3d at 485). *See Aramburu v. The Boeing Co.*, 112 F.3d 1398, 1401 n. 1 (10th Cir.1997).

The defendants' response to Swift–Eckrich's motion for summary judgment predominantly relies on the hearsay testimony of Ken Gardner, D & S's truck driver. Following the June 21, 1999 delivery, D & S retained the services of Central States Claims Service to investigate the circumstances surrounding that delivery of meat. Larry Reiter, a person employed by Central States Claims Service, tape-recorded his interview of Gardner, D & S's truck driver. It is fair to say that during that interview Gardner essentially states that the refrigeration system in the trailer was working properly during the entire time the meat was in his possession, that the meat delivered in Kansas was not warm due to his acts and that any blame for any problem associated with the delivery of the meat should be levied anywhere but on his or his employer's shoulders.

In attempting to demonstrate the existence of a genuine issue of material fact, the defendants' primarily rely on excerpts from the transcript of Gardner's statements made on the tape recording. Gardner has since disappeared and all parties apparently agree that his attendance cannot be procured by process or other reasonable means. Because Gardner is "unavailable," D & S contends that his tape-recorded statements are admissible under Fed.R.Evid. 804.

In pertinent part, Rule 804 provides:

(a) Definition of unavailability. "Unavailability as a witness" includes situations in which the declarant—

. . . . .

(5) is absent from the hearing and the proponent of a statement has been unable to procure the declarant's attendance (or in the case of a hearsay exception under subdivision (b)(2), (3), or (4), the declarant's attendance or testimony) by process or other reasonable means.

. . . . .

(b) Hearsay exceptions. The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:

(1) Former testimony. Testimony given as a witness at another hearing of the same or a different proceeding, or in a deposition taken in compliance with law in the course of the same or another proceeding, if the party against whom the testimony is now offered, or, in a civil action or proceeding, a predecessor in interest, had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination. . . .

■■■ Although the court is satisfied that Gardner is "unavailable" within the meaning of Rule 804(a)(5), that finding, standing alone, does not demonstrate that his tape-recorded statements are admissible. To qualify as a hearsay exception, the

witness must not only be unavailable but must also fall within one of the enumerated exceptions in subsection (b) of Rule 804. *See United States v. Bartelho,* 129 F.3d 663, 670 (1st Cir.1997) ("To admit offered testimony under Rule 804(b)(1), the proponent must satisfy both requirements of the rule: unavailability and similar motive and opportunity to develop the challenged testimony.") (*citing United States v. Salerno,* 505 U.S. 317, 321, 112 S.Ct. 2503, 2506–07, 120 L.Ed.2d 255 (1992)), *cert. denied,* —— U.S. ——, 119 S.Ct. 241, 142 L.Ed.2d 198 (1998). The defendants have not demonstrated, nor does it appear, that Gardner's statements fall within any of Rule 804's enumerated exceptions. Although Gardner's statements were tape-recorded, his statements were not taken during a deposition or another hearing. Nor do his statements satisfy any of the other requirements of Rule 804(b)(1) or any other exception listed in Rule 804. Swift–Eckrich was not present during the taping of Gardner's statement and therefore did not have an opportunity to develop the testimony of Gardner during cross-examination. *Cf. United States v. Stroble,* 173 F.3d 865, 1999 WL 252389 (10th Cir.1999) (unavailable witness' statements not admissible under Rule 804(b)(1) when the party and its counsel opposing the introduction of the statements were not present and able to cross-examine witness during the witness' prior testimony). Consequently, the court has completely disregarded any statements attributed to Gardner that are offered by the defendants. In light of this ruling, no genuine issue of material fact precludes summary judgment.

### Uncontroverted Facts

 Greatly simplified, in 1994 Swift–Eckrich entered a "Motor Transportation Agreement" with Advantage Systems. Pursuant to that contract, Advantage Systems agreed to be a broker of transportation services which would ship Swift–Eckrich's products. Advantage Systems undertook to perform those services in accordance with the authority issued by the former Interstate Commerce Commission. Under the terms of that agreement, Advantage Systems agreed, *inter alia,* to assume liability "of an insurer for the prompt and safe transportation of property entrusted to its care. . . ."

On June 20, 1996, Advantage Systems accepted shipment from Co–Pak Foods, Inc., in Sioux City, Iowa, for delivery to Swift–Eckrich at Millard Refrigerated Services, in Edwardsville, Kansas. The shipment consisted of 2260 cases of a product sold under the name "Maxpack." Maxpack is a prepackaged combination designed to be used as a school lunch. The primary ingredient is turkey, ham or bologna which requires refrigeration in transit. The bill of lading specified that the carrier must "maintain temperature in transit of 22 degrees." According to the affidavit of Don Fennelly, Director of Transportation at Swift–Eckrich, "[w]hen the trailer left Sioux City, the shipment was the equivalent of a 48' long block of ice."

Advantage Systems engaged the services of D & S to transport the shipment from Sioux City, Iowa, to Edwardsville, Kansas. D & S's driver arrived late for his unloading appointment at Edwardsville and was told to return at noon the next day.

June 21, 1996, was apparently a hot summer day in Edwardsville. Sometime in the afternoon, Gardner backed his trailer up to Millard Refrigerating Service's dock. The shipment was no longer icy. Immediately upon entering the opened trailer, workers at Millard Refrigerating Service knew that the load was "hot." Ernest Banks, one worker assigned by Millard Refrigerator Service to unload the trailer, described the event as follows:

> We opened the overhead door, and when [the truck driver] was done backing in, and you could just feel the hot heat coming off of the inside the truck, which normally it's cold blowing in your face.

Me and Johnnie immediately stopped, and I went and got Butch [the supervisor of the dock] and told him that the trailer was awful hot compared to normal trailers back then where you could feel the motors from the blowing or from being pretty cold. I told him that maybe something wrong with it. And he come out on the dock, asked us to take temps on it, which we did.

Blanks could feel the heat emanating from the boxes of meat. In his deposition, Blanks testified that "[y]ou can tell they haven't been cold all day long or however long they've been out there." Temperature readings of the shipment indicated that the products were not at 22 degrees, but instead ranged from 52 to 64 degrees.[3]

When Butch, the dock supervisor asked Gardner why the load of meat was warm, Gardner stated that the refrigerator unit on the trailer had not been working all day long.

Because the meat had been exposed to heat, Swift–Eckrich's quality control department concluded that "[t]he risk to consumers is too high to release the product for distribution." Consequently, Swift–Eckrich did not sell any part of the shipment for human consumption.

## Analysis

Based upon the uncontroverted facts, it is clear that Swift–Eckrich is entitled to summary judgment. Gardner's admissions make it clear that prior to the delivery of the shipment to Millard Refrigerating Service, D & S's refrigerated trailer malfunctioned. The temperature of the shipment rose from 22 degrees to around 60 degrees. Because the meat was exposed to the effects of the sweltering heat for an undetermined but apparently lengthy time period, Swift–Eckrich's subsequent decision to not sell the meat for human consumption was imminently reasonable. That four samples of the meat may have been deemed "fit for human consumption" does not prove that the entire shipment was suitable for human consumption. The defendants offer no proof that such a small sample of 2260 cases is sufficient to demonstrate that all of the meat in the trailer was safe for human consumption. In contrast, Swift–Eckrich has demonstrated that selling the meat products for human consumption would not have been prudent or appropriate under the circumstances. Swift–Eckrich is entitled to summary judgment on the issue of liability.

## Mitigation of Damages

Even if liability is established, the defendants contend that summary judgment is inappropriate on the amount of damages to be awarded Swift–Eckrich because Swift–Eckrich has not mitigated its damages. In advancing this mitigation of damages argument, the defendants contend that even if Swift–Eckrich did not want to sell the meat for consumption by school children, the meat was nevertheless fit for human consumption and could have been sold for some amount of money to some less discriminating consumers.

■■■ "The defendant has the burden to prove that the plaintiff did not exercise reasonable diligence in mitigating its damages." *Eastman Kodak Co. v. Westway Motor Freight, Inc.*, 949 F.2d 317, 320 (10th Cir.1991). "The aggrieved party need only take reasonable steps under the circumstances of the particular case to mitigate its damages." *Id.*

■■■ Because Swift–Eckrich's determination that it was singularly unwise to sell the meat for human consumption stands insufficiently controverted, no genuine issues of fact preclude the court from granting summary judgment on the issue of damages. Swift–Eckrich could not in good conscience sell the warm meat for human consumption. Because the defendants

---

**3.** The court is satisfied that the sheet containing the recordings of temperatures is sufficiently authenticated by Roach. Even if this were not so, Roach independently recalled that the temperature readings ranged from "55 to 60" degrees.

present no other possibility for the sale of the meat, no reasonable factfinder could conclude that Swift–Eckrich could have taken any other reasonable steps under the circumstances of this case to mitigate its damages.

### Pre–Judgment Interest

Swift–Eckrich contends that it is entitled to prejudgment interest on its claim. The defendants do not directly respond to this contention.

 "Under federal common law, the decision whether to award prejudgment interest rests within the court's sound discretion in balancing the different equitable considerations." *Koch v. Koch Industries, Inc.*, 996 F.Supp. 1273, 1279 (D.Kan.1998) (*citing Motion Picture Ass'n of America, Inc. v. Oman*, 969 F.2d 1154, 1157 (D.C.Cir.1992)). "Prejudgment interest compensates for the time value of money," *Motion Picture Ass'n of America, Inc. v. Oman*, 969 F.2d at 1157, and " 'is an element of [plaintiff's] complete compensation.' " *Koch*, 996 F.Supp. at 1279 (*quoting Osterneck v. Ernst & Whinney*, 489 U.S. 169, 175, 109 S.Ct. 987, 991, 103 L.Ed.2d 146 (1989)). It compensates the injured party "for being deprived of the monetary value of his loss from the time of the loss to the payment of the judgment." *U.S. Indus., Inc. v. Touche Ross & Co.*, 854 F.2d 1223, 1256 (10th Cir.1988).

 Tenth Circuit precedent establishes "that prejudgment interest normally should be awarded on successful federal claims." *FDIC v. UMIC, Inc.*, 136 F.3d 1375, 1388 (10th Cir.), *cert. denied,* ──── U.S. ────, 119 S.Ct. 404, 142 L.Ed.2d 328 (1998). "[A]lthough prejudgment interest is ordinarily awarded in federal cases, it is not recoverable as a matter of right." *Towerridge, Inc. v. T.A.O., Inc.*, 111 F.3d 758, 763 (10th Cir.1997). "[A]n award of prejudgment interest under federal law is governed by a two-step analysis." *Touche Ross & Co.*, 854 F.2d at 1257. "First, the trial court must determine whether an award of prejudgment interest would serve to compensate the injured party. Second, when an award would serve a compensatory function, the court must still determine whether the equities would preclude the award of prejudgment interest." *Id.*

 The court finds that an award of prejudgment interest would serve to compensate Swift–Eckrich. The court also finds that the defendants have not demonstrated that the equities override the goal of compensating the plaintiff. Swift–Eckrich is awarded prejudgment interest.

### Advantage Systems' Counterclaim Against Swift–Eckrich

The only remaining claim in this case is Advantage Systems' counterclaim against Swift–Eckrich for the amount of $9,103.80. In its answer, Swift–Eckrich ostensibly admits that it owes Advantage Systems for services rendered, but has apparently offset the amounts it owes to Advantage Systems against the sums it seeks to recover on its own claim arising out of the June 21, 1996, delivery. In light of the court's ruling on Swift–Eckrich's motion for summary judgment, the court believes this counterclaim can be quickly resolved by the parties. The court sets a date of June 30, 1999, at 10:00 a.m. for a telephone conference between counsel for Swift–Eckrich and Advantage Systems. The court will initiate the telephone call. At that time the parties will inform the court about the status of this remaining claim. If the parties have not resolved this claim, the court intends to set a briefing schedule requiring Advantage Systems to explain the basis of this court's continuing jurisdiction over this counterclaim and why this claim is not one that can be filed in state court.

IT IS THEREFORE ORDERED that Swift–Eckrich's "Motion for Enforcement of Settlement Agreement" (Dk.47) is denied.

IT IS FURTHER ORDERED that Swift–Eckrich's "Motion for Summary

Judgment" (Dk.37) on its claim against Advantage Systems and D & S is granted. Swift–Eckrich is awarded damages against the defendants in the amount of $26,-032.79. plus prejudgment interest and costs.

IT IS FURTHER ORDERED that a telephone conference to discuss the sole remaining claim in this case—Advantage Systems' counterclaim against Swift–Eckrich—is set for June 30, 1999, at 10:00 a.m.