**Stephen W. WALKER, Plaintiff,**

v.

**Marvin RUNYON, United States Postmaster General, and National Association of Letter Carriers, AFL–CIO, Defendants.**

**No. CIV. A. 95–2474–GTV.**

United States District Court, D. Kansas.

Sept. 15, 1997.

Elizabeth A. Phillips, Phillips & Phillips, Kansas City, MO, for Stephen W. Walker.

Robert A. Olsen, Office of U.S. Atty., Kansas City, KS, for U.S. Postal Service, Poster Master General, Marvin Runyon.

Thomas H. Marshall, Blake & Uhlig, P.A., Kansas City, KS, Peter D. Dechiara, Joseph J. Vitale, Cohen, Weiss & Simon, New York, NY, for National Association of Letter Carriers, AFL–CIO.

## MEMORANDUM AND ORDER

VAN BEBBER, Chief Judge.

Plaintiff brings this action claiming that the United States Postal Service subjected him to race discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–16. Plaintiff further claims that the Postal Service breached its collective bargaining agreement by terminating him for discriminatory reasons. Finally, plaintiff alleges that his union—the National Association of Letter Carriers—breached its duty of fair representation by failing to raise certain discrimination charges during his discharge hearing. The case is before the court on the summary judgment motions of the National Association of Letter Carriers (Doc. 24) and Postmaster General Marvin Runyon (Doc. 32). For the reasons set forth below, the motions are granted.

### I. Factual Background

The following facts are either uncontroverted or are based on evidence viewed in a light most favorable to the plaintiff. Immaterial facts and facts not properly supported by the record are omitted.

Plaintiff Steven W. Walker is a thirty-seven year old black male. In 1985, he took a pre-hire exam with the United States Postal Service and was placed on a career hire register. While waiting for a permanent position, plaintiff began work in 1991 as a "temporary employee" handling and processing mail. Because the Postal Service permits temporary employees to work a maximum of two years in that status, plaintiff had to cease his employment in early 1993. Upon his departure, he was given a "good leave slip" and recommended for a career appointment.

On August 26, 1993, the Postal Service issued plaintiff a call-in notice to interview for career positions. The letter required that plaintiff contact the Shawnee Mission Branch by September 2 or risk having his name removed from the hiring register. Plaintiff, however, did not receive the notice until September 19. After complaining to postal officials about the problem, plaintiff received interviews for a number of career positions. None of those interviews culminated in a job offer.

On November 15, 1993, plaintiff requested EEO counseling to discuss his employment difficulties at the Postal Service. Three weeks later, he filed an administrative charge of discrimination alleging that he had been denied employment on the basis of his race. The Postal Service's EEO Office issued a final decision on February 28, 1994, ruling that plaintiff's claim was untimely.

Within ninety days of receiving the Postal Service's administrative decision, plaintiff received call-in notices for several career positions. After successfully interviewing with members of the personnel department, plaintiff was hired as a Part Time Flexible ("PTF") City Carrier and commenced employment on August 6, 1994 at the Indian Springs Branch. Under the terms of the Postal Service's collective bargaining agreement with the National Association of Letter Carriers ("NALC"), the PTF City Carrier position included a ninety-day probationary period, during which time the Postal Service had the right to discharge probationary employees without establishing just cause.

The first two days of plaintiff's employment consisted of orientation training under the Postal Service's "Good Start Program." All new hires for carrier positions throughout the city went through the same program. After plaintiff completed his training, he reported to Bill Miller, a postal manager at the Indian Springs Branch and plaintiff's "first-line supervisor." Miller was responsible for assigning plaintiff his daily delivery routes and job duties. Miller assigned plaintiff to a four-hour "auxiliary route," an assignment entailing a four-hour primary delivery route followed by additional delivery duties (referred to as "splits"). A number of plaintiff's colleagues had six-hour routes that included no additional delivery obligations.

On September 9, 1994, Larry Krouse, a postal supervisor at the Indian Springs Branch, gave plaintiff his thirty-day Employee Probationary Period Evaluation Report. The report stated that plaintiff did not meet expectations based on his: (1) inability to maintain route schedule; (2) inconsistent delivery times; (3) unsafe work habits; and (4) poor casing skills. On October 6, 1994, Krouse gave plaintiff his sixty-day evaluation report indicating that plaintiff continued to fall short of Postal Service expectations. The second assessment specifically stated that plaintiff had shown no improvement in the areas identified in the first evaluation. On November 3, 1994, Krouse issued plaintiff his eighty-day evaluation report. According to this third report, although plaintiff had improved his work safety, his deficiencies remained in several key work areas and his overall performance did not meet expectations.

Defendant discharged plaintiff on November 3, 1994, one day prior to the conclusion of his probationary period. Following his termination, plaintiff contacted Don Shalz, the president of NALC Local Branch 499, and requested that NALC object to his discharge. Shalz suggested that plaintiff file a discrimination charge with the Postal Service's Equal Employment Opportunity office. Plaintiff heeded this advice and the resulting EEO complaint, filed March 10, 1995, forms the basis of his race discrimination and retaliation claims in the case at bar.

In addition to advising plaintiff to file an EEO charge, NALC, through its steward, Thomas Gibbons, informally requested that Postal Service officials extend plaintiff's probationary period for an additional ninety days. Management rejected this request. NALC then challenged plaintiff's discharge through the Union Management Pairs ("UMPS") program. NALC opted to pursue the case through this program because it believed plaintiff's probationary status excluded him from the Postal Service's formal grievance system.

The UMPS program, established in 1994, was designed to resolve disputes arising outside of the grievance arbitration procedure set forth in Article 15 of the parties' collective bargaining agreement. Under the UMPS scheme, if a workplace dispute, not subject to arbitration, cannot be settled between an NALC steward and Postal Service supervisor, the union submits the matter to a UMPS team for resolution. After a hearing at which the employee, his union steward, and a Postal Service supervisor are present, the UMPS team renders a decision on the dispute.

In March 1995, Gibbons submitted a UMPS worksheet protesting plaintiff's termination to Postal Service supervisor Steve Cartwright. In a subsequent meeting with Cartwright, Gibbons argued that plaintiff's discharge should be reversed because management had given plaintiff inadequate training and had failed to provide him with a sixty-day evaluation report. Cartwright rejected both arguments.

In May 1995, a UMPS team consisting of one representative from NALC—Ronald Pfaffly, and one representative from the Postal Service—Charles Pennewell, met to resolve the union's objections to plaintiff's termination. Also present at the hearing were plaintiff, Gibbons, Krouse, and an unidentified Postal supervisor. During the hearing, Gibbons argued that plaintiff should be reinstated to his job because the Postal Service had not provided plaintiff with: (1) proper training, (2) timely evaluations; and (3) notice of his discharge. Plaintiff made the same arguments at the hearing and also added an allegation that he had not been given an adequate opportunity during his probationary period to correct his performance deficiencies.

On May 26, 1995, the UMPS team issued a decision stating that the Postal Service had a right under Article 12, Section 1 of the collective bargaining agreement to discharge plaintiff. The team further observed that plaintiff had received training under the Good Start Program as well as from two letter carriers on two separate occasions. Finally, the UMPS team noted that plaintiff had been given a sixty-day evaluation report and had been notified several times of his performance problems.

After the UMPS team ruled, plaintiff waited for an administrative decision on his EEO charges. The Postal Service's EEO Office, however, issued no ruling prior to the expira-

tion of the 180–day dispositional deadline. This lawsuit ensued.

Additional facts will be provided as necessary.

## II.  Summary Judgment Standards

In deciding a motion for summary judgment, the court must examine any evidence tending to show triable issues in the light most favorable to the nonmoving party. *Bee v. Greaves,* 744 F.2d 1387, 1396 (10th Cir. 1984). A moving party is entitled to summary judgment only if the evidence indicates "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A genuine factual issue is one that "can reasonably be resolved only by a finder of fact because [it] may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986).

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. This burden may be discharged by "showing" that there is an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 2553–54, 91 L.Ed.2d 265 (1986). Once the moving party has properly supported its motion for summary judgment, the burden shifts to the nonmoving party, who "may not rest on mere allegations or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Anderson,* 477 U.S. at 256, 106 S.Ct. at 2514. Thus, the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. *Id.*

## III.  Discussion

Plaintiff predicates his Title VII claims on 42 U.S.C. § 2000e–16(a), a statute mandating, *inter alia,* that all personnel actions affecting employees or employee applicants in the United States Postal Service must be made free of racial discrimination. Plaintiff alleges that the United States Postal Service violated this statute by subjecting him to race discrimination throughout his employment and retaliating against him for having

filed an EEO discrimination charge in November 1993.

### A.  Race Discrimination

To prevail on his race discrimination claim, plaintiff must establish that defendant had a discriminatory motive or intent. *Ortega v. Safeway Stores, Inc.,* 943 F.2d 1230, 1236 (10th Cir.1991). Plaintiff need not prove that defendant's employment actions were motivated solely by race, but he must show that his race was "the factor that made a difference." *Elmore v. Capstan, Inc.,* 58 F.3d 525, 530 (10th Cir.1995). In other words, plaintiff must establish that he was treated in a manner which, but for his race, would have been different. *Clark v. Atchison, Topeka & Santa Fe Ry. Co.,* 731 F.2d 698, 702 (10th Cir. 1984). Plaintiff offers no direct evidence that defendant discriminated against him on the basis of race, but relies instead on circumstantial evidence to prove defendant's discriminatory intent. To insure an efficient presentation of circumstantial evidence, the Tenth Circuit has adopted the burden shifting scheme originally set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

Under the *McDonnell Douglas* framework, plaintiff first must establish a prima facie case of discrimination. If plaintiff succeeds, the burden of production shifts to defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment decisions. *Randle v. City of Aurora,* 69 F.3d 441, 451 (10th Cir.1995). Assuming defendant meets that burden, all presumptions of discrimination drop from the case. *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 507, 113 S.Ct. 2742, 2747, 125 L.Ed.2d 407 (1993). The burden then shifts back to plaintiff to prove by a preponderance of the evidence that defendant's proffered reasons for the challenged actions are merely a pretext for discrimination. *Randle,* 69 F.3d at 451.

To establish a prima facie case of race discrimination, plaintiff must show that: (1) he is a member of a racial minority; (2) his job performance was satisfactory; (3) he was adversely affected by defendant's employment decisions; and (4) he was treated differently than similarly situated non-minority employees. *See Martin v. Nannie & the*

*Newborns, Inc.*, 3 F.3d 1410, 1417 (10th Cir. 1993); *McAlester v. United Air Lines, Inc.*, 851 F.2d 1249, 1260 (10th Cir.1988).

■ The Postal Service suggests that plaintiff is unable to meet the second and fourth prongs of the prima facie test. With respect to the second prong, the Postal Service contends that plaintiff failed to demonstrate adequate competency as a PTF City Carrier during his probationary period. The Tenth Circuit, however, has held that an employer's proffered reason for taking an adverse employment action is not to be considered in assessing the sufficiency of plaintiff's prima facie case. *Kenworthy v. Conoco, Inc.*, 979 F.2d 1462, 1470 (10th Cir.1992) (citing *MacDonald v. Eastern Wyoming Mental Health Center*, 941 F.2d 1115, 1119–20 (10th Cir.1991)). To the contrary,

> a plaintiff may make out a prima facie case of discrimination in a discharge case by credible evidence that [he] continued to possess the objective qualifications [he] held when [he] was fired, or by [his] own testimony that [his] work was satisfactory, even when disputed by [his] employer, or by evidence that [he] held [his] position for a significant period of time.

*MacDonald*, 941 F.2d at 1121 (citations omitted). Plaintiff satisfied this element of his prima facie case not only through his own declaration and deposition testimony, but also by the fact that he continued to possess the same objective qualifications throughout his employment.

■ The fourth prong is far more problematic for plaintiff. In an attempt to demonstrate that the Postal Service treated him less favorably than similarly situated non-minority employees, plaintiff identifies three individuals who allegedly received "preferred" six-hour routes with no other delivery obligations. Plaintiff contrasts those assignments to his own in which he had to follow up his normal four-hour route with additional deliveries to various areas in the community. Plaintiff's argument is unpersuasive. Two of the employees—Derinda Nickerson and an unnamed male working at the Indian Springs Branch—are black and, thus, do not support an inference of race discrimination. The third individual—Tony

DeRossett, a white transitional employee, is an inappropriate model for comparison. DeRossett completed his training a year before plaintiff arrived and was never on probation during plaintiff's tenure. DeRossett's duties and responsibilities were the same as all non-probationary carriers. As an inexperienced probationary employee subject to distinct disciplinary and performance standards, plaintiff was not similarly situated to DeRossett. *See Aramburu v. The Boeing Co.*, 112 F.3d 1398, 1404 (10th Cir.1997) (discussing factors to be compared in determining whether employees are similarly situated); *EEOC v. Flasher Co.*, 986 F.2d 1312, 1319–20 (10th Cir.1992) (same).

■ Plaintiff next alleges that he received training inferior to that of his non-minority probationary colleagues. In support of this contention, plaintiff identifies only a single white female named Becky who purportedly told him that she had received one more day of training than he. This averment does not support plaintiff's prima facie case. Although plaintiff "need not produce evidence in a form that would be admissible at trial, ... the content or substance of the evidence must be admissible." *Thomas v. IBM*, 48 F.3d 478, 485 (10th Cir.1995) (citations omitted). Evidence premised on inadmissible hearsay "is not suitable grist for the summary judgment mill." *Id.*

Plaintiff devotes a significant portion of his opposition brief to an attack on the Postal Service's training and evaluation methods. He vehemently insists that his poor evaluations were unjustified and that his work was satisfactory. Plaintiff's rhetoric, however, is largely irrelevant. The Tenth Circuit has made clear that mere irrational or unfair treatment of an employee does not violate Title VII. *Flasher Co.*, 986 F.2d at 1319–20. The only relevant inquiry is whether the employer's decision was predicated on its employee's protected status. Id. at 1320. Because plaintiff has advanced no competent evidence of race discrimination in the case at bar, his Title VII claims must be dismissed.[1]

### B. *Retaliation*

■ Plaintiff further claims that the Postal Service retaliated against him for having

---

1. Plaintiff's inability to satisfy the prima facie test for race discrimination is not itself fatal to his claim. *See Greene v. Safeway Stores, Inc.*, 98 F.3d 554, 559–60 (10th Cir.1996). The Tenth

Circuit has held that a plaintiff may prove unlawful discrimination either by relying on a prima facie proof scheme *or* by presenting direct or

filed an EEO race discrimination charge in December 1993. To establish a prima facie case of retaliation under Title VII, a plaintiff must show that: (1) he engaged in protected opposition to discrimination; (2) he suffered adverse action from his employer; and (3) there was a causal connection between his protected activity and his employer's adverse action. *Sauers v. Salt Lake County,* 1 F.3d 1122, 1128 (10th Cir.1993).

Although conceding that plaintiff has demonstrated the first and second elements of his prima facie case,[2] the Postal Service insists that plaintiff is unable to show a "causal connection" between his December 1993 EEO filing and any adverse employment action. The court agrees. Plaintiff bases his retaliation claim on the fact that William Miller, the postal supervisor responsible for giving plaintiff his daily assignments, knew plaintiff's address on plaintiff's first day of work. Plaintiff argues that the only way Miller could have known his address was if Miller had seen plaintiff's EEO complaint.

Plaintiff's allegations do not support a causal connection. A causal connection can exist only if the individual who took adverse against plaintiff knew of plaintiff's protected activity. *Williams v. Rice,* 983 F.2d 177, 181 (10th Cir.1993). The mere fact that Miller knew plaintiff's address does not indicate that he was aware plaintiff had filed discrimination charges with the Postal Service's EEO office. Indeed, plaintiff's home address appeared on numerous employment documents routinely disseminated to branch supervisors.

Moreover, even if Miller did know of plaintiff's administrative charges, such knowledge hardly creates a genuine issue of material fact on plaintiff's retaliation claim. Awareness of a plaintiff's protected activity, without more, does not create an inference of unlaw-

ful retaliation. The Tenth Circuit has held that protected conduct closely followed by adverse action *may* support an inference of a retaliatory motive. *Marx v. Schnuck Markets, Inc.,* 76 F.3d 324, 329 (10th Cir.), *cert. denied,* —— U.S. ——, 116 S.Ct. 2552, 135 L.Ed.2d 1071 (1996). In interpreting *Marx,* however, the circuit has underscored that unless the employer's adverse action "is very closely connected in time to the protected conduct, the plaintiff will need to rely on additional evidence beyond mere temporal proximity to establish causation." *Conner v. Schnuck Markets, Inc.* 121 F.3d 1390, 1395 (10th Cir.1997). *See also Richmond v. ONEOK, Inc.,* 120 F.3d 205, 209 (10th Cir. 1997) (three-month period between plaintiff's protected activity and her termination, standing alone, does not demonstrate a causal connection).

Although plaintiff's arguments are disjointed and confusing, he appears to suggest that Miller initiated a pattern of retaliatory conduct shortly after plaintiff began his employment in August 1994. He contends that Miller assigned him undesirable routes and imposed upon him duties that no other probationary employee had ever been given. (Pl.'s Resp. to Runyon's Mot. for Summ. J. at 5–7). Not only is this argument completely unsubstantiated, it is contradicted directly by the Postal Service's uncontroverted evidence. (Runyon's Reply to Pl.'s Resp. at 7–8). Indeed, the record contains multiple examples of probationary employees assigned responsibilities virtually identical to those given to plaintiff.

Plaintiff also maintains that his adverse evaluations underscore a retaliatory motive. The court disagrees. Plaintiff's conclusory allegations, all of which are based on mere conjecture and hearsay, evidence no retaliation. To establish the requisite causal connection for a retaliation claim, plaintiff must demonstrate that he suffered different treatment from his employer after engaging in protected activity than before doing so.[3] *See*

---

2. Although plaintiff argues that he suffered "adverse action" in the form of differential treat-

circumstantial evidence that race was a motivating factor in the challenged employment decisions. *See id.* In the case at bar, however, plaintiff has provided no competent evidence—direct or circumstantial—suggesting that the Postal Service discriminated against him on the basis of race.

ment throughout his employment, the Postal Service maintains that the only adverse action taken against plaintiff was his November 1994 discharge. The dispute, however, is irrelevant inasmuch as the court finds that plaintiff cannot satisfy the third prong of his prima facie case.

3. A plaintiff is excused from showing that he endured distinct treatment *after* engaging in protected conduct only if he alleges that his employ-

*Richmond,* 120 F.3d at 209; *Marx,* 76 F.3d at 329. If plaintiff had received positive evaluations prior to his filing of EEO charges, subsequent negative reviews might indicate a retaliatory motive. Plaintiff's poor work assessments, however, began as soon as he commenced employment. Under such circumstances, no retaliatory motive can be inferred.

In sum, the nexus between Miller's knowledge of plaintiff's EEO filing and plaintiff's employment difficulties is extremely attenuated. As the Supreme Court has articulated, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson,* 477 U.S. at 252, 106 S.Ct. at 2512. No such competent evidence having been presented in the instant action, summary judgment in favor of the Postal Service is warranted.

## C. *Breach of Contract/Duty of Fair Representation*

In Count III of his complaint, plaintiff alleges that the Postal Service breached its collective bargaining agreement by terminating him for discriminatory reasons. He also contends that NALC breached its duty of fair representation by failing to raise certain discrimination charges at his discharge hearing. The Supreme Court has denominated this type of joint cause of action as a "hybrid suit," encompassing two separate but interrelated claims. *See DelCostello v. International Bhd. of Teamsters,* 462 U.S. 151, 164–65, 103 S.Ct. 2281, 2290–91, 76 L.Ed.2d 476 (1983). The suit against the Postal Service is predicated on an alleged breach of the collective bargaining agreement, thereby falling under section 301(a) of the Labor Management Relations Act, 29 U.S.C. § 185(a).[4] *See id.* at 164, 103 S.Ct. at 2290–91. The duty of fair representation claim against NALC arises implicitly under the National Labor Relations Act's statutory scheme. *See id.* at

164 & n. 14, 103 S.Ct. at 2290 & n. 14 (citing *Vaca v. Sipes,* 386 U.S. 171, 177, 87 S.Ct. 903, 909–10, 17 L.Ed.2d 842 (1967)).

Because the two claims in a hybrid suit are "inextricably interdependent," a plaintiff may not prevail against either his employer or his union unless he establishes that his discharge contravened the collective bargaining agreement *and* that his union breached its duty of fair representation. *Id.* at 164–65, 103 S.Ct. at 2290–91; *see also Edwards v. International Union, United Plant Guard Workers,* 46 F.3d 1047, 1051–52 (10th Cir.) (discussing the nature of hybrid suits), *cert. denied,* —— U.S. ——, 116 S.Ct. 60, 133 L.Ed.2d 23 (1995). The court need only discuss the breach of duty of fair representation claim levelled against NALC.

A union breaches its duty of fair representation only if its conduct toward a member of the collective bargaining unit is arbitrary, discriminatory, or in bad faith. *Vaca,* 386 U.S. at 190, 87 S.Ct. at 916–17. The Supreme Court has explained that "a union's actions are arbitrary only if, in light of the factual and legal landscape at the time of the union's actions, the union's behavior is so far outside a 'wide range of reasonableness' as to be irrational." *Air Line Pilots Ass'n v. O'Neill,* 499 U.S. 65, 67, 111 S.Ct. 1127, 1130, 113 L.Ed.2d 51 (1991) (citation omitted). A union's conduct is discriminatory if it engages in actions based on prejudice, animus, or "invidious" distinctions "such as race or other constitutionally protected categories." *Considine v. Newspaper Agency Corp.,* 43 F.3d 1349, 1359–60 (10th Cir.1994) (citing *Ford Motor Co. v. Huffman,* 345 U.S. 330, 337, 73 S.Ct. 681, 685–86, 97 L.Ed. 1048 (1953), and *Steele v. Louisville & Nashville R.R. Co.,* 323 U.S. 192, 203, 65 S.Ct. 226, 232, 89 L.Ed. 173 (1944)). A union exhibits bad faith only if it acts in a fraudulent, deceitful, or dishonest fashion. *Id.* at 1361 (citation omitted).

---

er discriminated against him in *anticipation* of his protected conduct.

**4.** Plaintiff's action against the Postal Service technically arises under section 1208(b) of the Postal Reorganization Act, 39 U.S.C. § 1208(b). Because the language of that statute is identical

in all relevant respects to section 301(a) of the Labor Management Relations Act, case law interpreting the latter is applicable to section 1208(b). *See Bowen v. United States Postal Serv.,* 459 U.S. 212, 232 n. 2, 103 S.Ct. 588, 600 n. 2, 74 L.Ed.2d 402 (1983) (White, J., concurring in part and dissenting in part).

The highly deferential standard of judicial review accorded to union activities is designed to provide unions with significant latitude in the performance of their representative duties. *See Steelworkers v. Rawson*, 495 U.S. 362, 374, 110 S.Ct. 1904, 1912, 109 L.Ed.2d 362 (1990); *Vaca*, 386 U.S. at 191–93, 87 S.Ct. at 917–18. This deference recognizes the often conflicting interests among rank and file members and the need for a union to make judgments that are not always in the best interests of every constituent. Although a union's discretion is more restricted in processing members' individual grievances than it is in negotiating collective bargaining agreements, *Thomas v. United Parcel Serv., Inc.*, 890 F.2d 909, 919 (7th Cir.1989), the deference afforded the union in the grievance context remains quite broad. *See Chernak v. Southwest Airlines Co.*, 778 F.2d 578, 581 (10th Cir.1985).

█ Plaintiff claims that NALC breached its duty of fair representation in a variety of ways. He first contends that the union improperly referred his allegations to the UMPS program rather than filing a formal grievance on his behalf. This argument has no merit. The collective bargaining agreement in place expressly foreclosed plaintiff's right to pursue his complaints through the formal grievance process. Article 12, Section 1 of the agreement states that the Postal Service "shall have the right to separate from its employ any probationary employee at any time during the probationary period and *these probationary employees shall not be permitted access to the grievance procedure in relation thereto.*" (Pfaffly Decl., Ex. A at 18) (emphasis added).

Plaintiff insists that, despite his probationary status, he had a right to avail himself of the grievance procedure under Article 2, Section 3 of the agreement.[5] The court disagrees. The provision that plaintiff cites simply describes the time requirements for filing grievances pursuant to the agreement's anti-discrimination clause. In no way does that paragraph trump Article 12, Section 1's exclusion of probationary employees from the Postal Service's formal grievance process.

Indeed, two prior cases interpreting collective bargaining agreements virtually identical to the one at issue here have rejected plaintiff's argument. *See American Postal Workers Union v. United States Postal Serv.*, 755 F.Supp. 1076, 1077–79 (D.D.C.1989), *aff'd*, 940 F.2d 704 (D.C.Cir.1991) (Article 2 clause prohibiting discrimination does not allow probationary employees to invoke formal grievance procedure); *see also United States Postal Serv. v. American Postal Workers Union*, 922 F.2d 256, 259–60 (5th Cir.1991) (Articles 19 and 21, the relevant terms of which are identical to those in the instant action's collective bargaining agreement, do not authorize probationary employees to file formal grievances).

█ Plaintiff next contends that NALC refused to allow him to have his own representative at the UMPS hearing. The record does not support this argument. Plaintiff conceded at his deposition, in fact, that he never asked union officials if his attorney or personal advocate could attend the hearing. Even if NALC had refused such a request, employees have no right to have their independently retained counsel accompany them to an arbitration proceeding. *See Valentin v. United States Postal Serv.*, 787 F.2d 748, 751 (1st Cir.1986); *Castelli v. Douglas Aircraft Co.*, 752 F.2d 1480, 1483–84 (9th Cir.1985). By sending a union official to assist plaintiff at his UMPS hearing, NALC adequately fulfilled its representative obligations.

█ Plaintiff further claims that the union steward who attended his hearing, Thomas Gibbons, failed to raise key arguments and did not press plaintiff's case with sufficient vigor. Plaintiff specifically objects to Gibbons' decision not to assert race discrimination or retaliation charges during the hearing. The court perceives no prejudice from Gibbons' conduct. As the court described in detail above, the Postal Service subjected plaintiff to neither unlawful discrimination nor retaliation during his tenure, thereby obviating the need for NALC to raise such claims at plaintiff's discharge hearing. *See*

---

5. Article 2, Section 3 of the agreement provides: "Grievances [alleging discrimination] may be filed at Step 2 of the grievance procedure within fourteen days of when the employee or the Union

has first learned or may reasonably have been expected to have learned of the alleged discrimination...."

*Vaca,* 386 U.S. at 191, 87 S.Ct. at 917 (union need not pursue meritless grievances). If a union was required to assert every claim that a member requested, irrespective of merit, the union's resources and credibility would be depleted rapidly, and the arbitration machinery ultimately would become overburdened. *York v. AT&T Co.,* 95 F.3d 948, 956 (10th Cir.1996) (citing *Vaca,* 386 U.S. at 191–92, 87 S.Ct. at 917–18).

Moreover, even if plaintiff had endured unlawful discrimination, the Postal Service's EEO procedure provided him with an adequate means to assert such allegations. NALC's local branch president, Don Schalz, suggested to plaintiff that he file an EEO complaint, a suggestion that plaintiff conceded in his deposition was good advice. The fact that the union opted not to raise the discrimination allegations at plaintiff's UMPS hearing is not a valid basis for subjecting the union to liability. The court "will not second-guess a union's good faith, nondiscriminatory judgment in evaluating the merits of a grievance ... or in presenting the grievance at an arbitration hearing." *Young v. United Auto. Workers Labor Employment & Training Corp.,* 95 F.3d 992, 997 (10th Cir.1996) (alteration in original) (quoting *Stevens v. Moore Business Forms, Inc.,* 18 F.3d 1443, 1447–48 (9th Cir.1994)). "Mere negligence, poor judgment, or ineptitude in grievance handling are insufficient to establish a breach of the duty of fair representation." *Id.* (citation omitted).

Finally, even if Gibbons was not particularly zealous in his defense of plaintiff, the mere fact that a union failed to represent a member's interests "as vigorously as it could have does not establish a section 301 violation." *Mock v. T.G. & Y. Stores Co.,* 971 F.2d 522, 531 (10th Cir.1992). To rule otherwise would force the court to substitute its own judgment for that of union officials, a scenario fraught with negative repercussions and one which the court is unwilling to embrace. *See Young,* 95 F.3d at 998.[6] Accordingly, the court grants summary judgment to NALC on plaintiff's breach of duty of fair representation claim and, by implication, to the Postal Service on plaintiff's breach of contract claim.

IT IS, THEREFORE, BY THE COURT ORDERED that the National Association of Letter Carriers' motion for summary judgment (Doc. 24) is granted.

IT IS FURTHER ORDERED that the Postmaster General Marvin Runyon's motion for summary judgment (Doc. 32) is granted.

The case is closed.

**IT IS SO ORDERED.**

---

**6.** The fact that NALC referred plaintiff's grievance to a joint labor-management team rather than to a neutral arbitrator does not alter the court's analysis of plaintiff's fair representation claim. *See General Drivers, Warehousemen & Helpers, Local Union No. 89 v. Riss & Co.,* 372 U.S. 517, 519, 83 S.Ct. 789, 791, 9 L.Ed.2d 918 (1963) (per curiam) (holding that the policy of the Labor Management Relations Act "can be effectuated only if the means chosen by the parties for settlement of their differences under a collective bargaining agreement is given full play.").